# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**
September 9, 2014

Lyle W. Cayce
Clerk

No. 13-40767

———————

UNITED STATES OF AMERICA,

Plaintiff–Appellee

v.

JEFFREY TODD HOWARD,

Defendant–Appellant

———————

Appeal from the United States District Court
for the Southern District of Texas

———————

Before HIGGINBOTHAM, JONES, and PRADO, Circuit Judges.

EDWARD C. PRADO, Circuit Judge:

This appeal from a bench trial verdict raises a difficult question concerning the criminal law of attempt. The government caught the Defendant–Appellant Jeffrey Howard ("Howard") in a sting operation. A government agent impersonated a mother offering up her two minor daughters for sex. Howard sent the agent sexually explicit photographs and asked that she show the photographs to the girls. He also suggested that the agent procure birth control for and perform sex acts on her daughters to get them ready for him. But Howard did not make travel arrangements to Corpus Christi, Texas—where the fictional mother and her two daughters lived. Further, the government agent tried to get Howard to commit to book a flight—instructing Howard to "take it or leave it," and Howard responded "okay, I'll

leave it." Three months, later the police arrested Howard in California. Howard was convicted by bench trial of attempt to knowingly persuade, induce, entice, or coerce a minor to engage in illegal sexual activity in violation of 18 U.S.C. § 2422(b).[1] He appeals challenging the sufficiency of the evidence and the constitutionality of the statute.

The principal question in this appeal is whether Howard's conduct crossed the line from "preparation" to "attempt" to knowingly persuade, induce, entice, or coerce a minor to engage in illegal sexual activity. We address this question, and Howard's constitutional arguments, in turn below, informed by the applicable law and the record in this case.

## I. BACKGROUND

Because this appeal involves a challenge to the sufficiency of the government's proof, we summarize the facts below in the light most favorable to the bench trial finding of guilt, consistent with the record. *See United States v. Morgan*, 311 F.3d 611, 613 (5th Cir. 2002). The evidence supporting Howard's conviction was gathered through a three-week sting operation in which Detective Alicia Escobar of the Corpus Christi Police Department posed as the mother of two fictitious underage girls from February through March 2012. During this time period, Howard was unemployed and living with his girlfriend in California. As a result of a basketball injury to his back, Howard

---

[1] 18 U.S.C. § 2422(b) provides:

Whoever, using the mail or any facility or means of interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States knowingly persuades, induces, entices, or coerces any individual who has not attained the age of 18 years, to engage in prostitution or any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be fined under this title and imprisoned not less than 10 years or for life.

In this case, the sexual activity that Howard could have been charged with was sexual assault under the Texas Penal Code § 22.011.

was bedridden. Detective Escobar, posing as the fictitious mother, "Melinda Posada," was introduced to Howard through Iris Cabrielez.

## A.    The Criminal Investigation

The criminal investigation of Howard started after he corresponded with Iris Cabrielez. What began as small talk on a social-networking website escalated into a flirtation and finally took a turn when Howard brought up "taboo" and asked Cabrielez, "can you get me a quince?"[2] Cabrielez took this to mean that Howard was asking for a fifteen-year-old girl for sex. Cabrielez said no and explained: "I would never put a person lol in that position." Howard replied: "Okay. Well it's worth 5k a piece, but okay." Howard asked Cabrielez to "[f]ind me one. Do you have a daughter?" When Cabrielez said, "no," Howard pressed on: "Does any of your home girls?" Cabrielez replied: "I was raped at 13. I would never put a kid in that position. . . . I have a 15-year-old niece who I can't stand lol but never put her in a position like that." To which Howard replied, "send me a pic" and then said, "I want to see your niece babe." Cabrielez took a screen shot of the conversation on her phone and went to the authorities.

Cabrielez contacted Detective Alicia Escobar. Detective Escobar works with the Corpus Christi Police Department's Internet Crimes Against Children Task Force. Detective Escobar created a fictitious persona, Melinda Posada, complete with an email address, instant-message account, and Facebook profile. Cabrielez introduced Howard to Melinda Posada as her friend with access to children.

The next day, Howard sent an email to Detective Escobar's fictitious persona's email address.[3] Detective Escobar replied: "[Cabrielez] mentioned

---

[2] *Quince* means "fifteen" in Spanish.

[3] For convenience, we refer to Detective Escobar here even though she was posing as Melinda Posada.

3

taboo. Can you tell me more?" Howard responded: "I'm sorry over the phone would be better, not over email." Howard sent her his phone number, and they made a plan to talk the next day.[4]

Howard called Detective Escobar. On the call, Detective Escobar asked Howard: "What are you looking for? [Cabrielez] told me . . . that you wanted her to get you a 15-year old. I said, I don't know if I can help because my daughter is 14 . . . and I have an 11-year-old daughter." Howard confirmed that he was interested in having sex with children, and that he was interested in having sex with Detective Escobar's 14-year-old. He also explained that he did not want to wear a condom to have sex with her daughters, and that he was "disease free and he had paperwork to provide" to Detective Escobar, though he never sent any such paperwork. He also said that "he would definitely travel to Corpus Christi to have sex with [Detective Escobar's] daughter."

Howard asked for photographs of Detective Escobar's daughter and offered to and ultimately did send a picture of his penis. Detective Escobar testified at trial that, based on her training and experience, she thought that Howard sent the picture "[t]o confirm that he was not a cop, as well as to convince me to send a picture . . . to make sure that [the daughters] were real and I was who I was saying I was."

The trial court admitted audio recordings and transcripts of telephone and electronic-messaging conversations between Howard and Detective Escobar containing explicit sexual talk. In the conversations, Howard described with specificity and detail the sex acts he intended to perform with the underage girls and their mother. He often masturbated during these

---

[4] Detective Escobar testified that, in her experience, suspects "automatically prefer to talk on the phone because they don't want evidence, and they don't want anything to be able to be recovered."

conversations. At one point, Detective Escobar accused Howard of being "all talk," and he replied: "I'm not."

In one conversation, Detective Escobar asked Howard: "What do you want me to do to get them [the girls] ready?" He asked her to perform oral sex on the girls. "I ain't going to do that," she said. "That's your job lol. Maybe I'll look up someone down here so they can get 'em started," Detective Escobar said. "No. I want to be first," Howard replied. "Just get a dildo," he proposed.

Detective Escobar testified that "people who are sexually interested in children . . . have particular ideas as far as getting the children ready." She called this behavior "grooming": "[T]hey want you to do different things to your children in order to make them ready, especially if they never have had sex before."

In telephone conversations and over email, Howard also discussed the girls' birth control with Detective Escobar. After Detective Escobar told him that her fourteen-year-old daughter had been prescribed birth control, Howard asked, "Did she get the shot? The shot's better."

Detective Escobar also spoke with Howard about possible travel plans. Howard asked Detective Escobar "How far are you from El Paso?" At this point in the investigation, Detective Escobar believed that Howard "was in El Paso or near El Paso . . . and he was actually trying to see how far it would take him to drive." After Detective Escobar told Howard that the drive was about ten hours, Howard replied: "Damn. That far lol. Yes. Wish I could come to Corpus. I'm really ex[c]ited about how my girls doing." Howard asked whether Detective Escobar had shown the girls the picture of his penis; she said yes and that "the girls were now curious about having sex with him." Howard responded: "that's awesome. I can't wait for all three of us to be cool and be like a happy family." Howard explained that he had not checked flights yet, but said "I will, though. This is going to be awesome . . . am I dreaming lol???"

No. 13-40767

Howard said "he would definitely travel to Corpus Christi to have sex with [Detective Escobar's] daughter," asked what airport he should fly into, mentioned he could fly Southwest Airlines, and inquired about specific hotels.

Detective Escobar pressed Howard to get him to commit to traveling to Corpus Christi: "Hey . . . what does your schedule look [like] for next month? Can you squeeze us in? I think the girls are nervous and anxious," Detective Escobar said. Howard replied: "Okay. I will look up some flights, idk [(short for 'I don't know')]. I'm so busy these next few months, but I'll see what's up." Detective Escobar testified that Howard never, to her knowledge, rented a car, booked a flight, purchased a bus ticket, made a hotel reservation, or gave any other indication that he was going to travel on a certain date and time to meet with Detective Escobar's children. Detective Escobar sent him the phone numbers for three hotels and told him the closest airport is Corpus Christi International Airport.

In the last telephone conversation in March 2012, Howard demanded that Detective Escobar send him photographs or put one of her daughters on the phone: "Put Brit on 3-way," he demanded, in the midst of a graphic, highly sexual conversation. Detective Escobar refused: "No convos til you're here. I don't want to scare her. I want this to be a good thing for her. I want her to feel it before she hears you." Howard replied: "Well, honestly, I want to make sure I am not coming for nothing. . . . [I am] [p]robably walking into a trap." Later, Howard asked: "why do I have to book a flight to talk to the girls? That doesn't make sense. What difference does it make?"

At this point, Detective Escobar testified that she drew a "line in the sand": "You ain't talking to the girls. I told you that that I ain't getting their hopes up and introducing when you ain't even here. Take it or leave it." Howard responded: "Okay. I'll leave it. You don't talk to me like that. Nobody does." This message was the last time Howard contacted Detective Escobar.

6

Three months later, the police arrested Howard in Northridge, California.

**B.    The Bench Trial**

Howard waived his right to a jury trial and proceeded to bench trial before the district judge.  At the close of the government's case in chief, Howard through counsel moved for a directed verdict.  Howard argued the government did not prove that Howard took a "substantial step" because his conduct amounted to mere preparation.  The district court orally rejected Howard's motion for a directed verdict and explained: "Sending a picture of his penis to [an] undercover officer and asking her to show it to minors, it would be hard to overlook that as a substantial step."   The district court apparently was persuaded by the Eleventh Circuit's decision in *United States v. Lee*, 603 F.3d 904 (11th Cir. 2010).

The district court found Howard guilty and sentenced him to 120-months imprisonment, the mandatory-minimum sentence.  Howard timely appeals.

## II.    JURISDICTION AND STANDARD OF REVIEW

The district court had jurisdiction under 18 U.S.C. § 3231, and this Court has jurisdiction under 28 U.S.C. § 1291 to review the district court's final judgment.  We review a district court's finding of guilt after a bench trial "to determine whether it is supported by any substantial evidence." *United States v. Allen*, 587 F.3d 246, 256 (5th Cir. 2009) (per curiam) (quoting *United States v. Serna–Villarreal*, 352 F.3d 225, 234 (5th Cir. 2003)) (internal quotation marks omitted).  "[E]vidence is sufficient to sustain a conviction if any rational trier of fact could have found that the evidence established guilt beyond a reasonable doubt.  This court examines the evidence as a whole and construes it in the light most favorable to the verdict." *Id.* (alteration omitted) (quoting *Serna–Villarreal*, 352 F.3d at 234) (internal quotation marks omitted).

We review preserved challenges to the constitutionality of a criminal statute de novo. *United States v. Clark*, 582 F.3d 607, 612 (5th Cir. 2009). But if the constitutional challenge was not presented to the district court, we review for plain error. *United States v. Knowles*, 29 F.3d 947, 950 (5th Cir. 1994). Plain error exists if "(1) there is an error, (2) the error is plain, (3) the error affects substantial rights[,] and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Garcia–Carrillo*, 749 F.3d 376, 378 (5th Cir. 2014) (per curiam) (alterations and internal quotation marks omitted).

## III.   DISCUSSION

Howard seeks reversal of his criminal conviction on two grounds. First, Howard argues there was insufficient evidence to support his conviction for violation of § 2422(b) because he did not take a substantial step toward enticing a minor to have illegal sex. Second, Howard contends the "attempt" provision of § 2422(b) is unconstitutionally vague and overbroad because it criminalizes free speech. We address each argument in turn.

### A.   Howard's Challenge to the Sufficiency of the Evidence

Federal courts, including the Fifth Circuit, apply the Model Penal Code's "substantial step" test to determine whether a defendant's conduct manifests attempt to commit a crime. *See, e.g.*, *United States v. Hernandez–Galvan*, 632 F.3d 192, 198 (5th Cir. 2011) ("[T]he 'substantial step' test from the Model Penal Code . . . is now the majority view among the states and federal courts, including the Fifth Circuit."). This test has two elements: (1) the specific intent to commit the underlying crime, *mens rea*, and (2) conduct which constitutes a "substantial step" toward the commission of the crime, *actus reus*. *United States v. Barlow*, 568 F.3d 215, 219 (5th Cir. 2009). This "'substantial step' approach asks whether a person 'purposely does or omits to do anything that, under the circumstances as he believes them to be, is an act or omission

8

constituting a substantial step in a course of conduct planned to culminate in his commission of the crime.'" *Hernandez–Galvan*, 632 F.3d at 198 (quoting Model Penal Code § 5.01(1)(c)).

The "substantial step" must be conduct that strongly corroborates the firmness of the defendant's criminal intent. *Id.* Acts which are merely preparatory are not enough. *United States v. Mandujano*, 499 F.2d 370, 377 (5th Cir. 1974). A "substantial step" is "more than mere preparation," but is "less than the last act necessary before" the crime is in fact committed. *United States v. Manley*, 632 F.2d 978, 987–88 (2d Cir. 1980). This requirement "prevents the conviction of persons engaged in innocent acts on the basis of a mens rea proved through speculative inferences, unreliable forms of testimony, and past criminal conduct." *United States v. Oviedo*, 525 F.2d 881, 884–85 (5th Cir. 1976).[5]

To determine whether Howard's conduct crossed the line between preparation and attempt, we must first clearly define the conduct that § 2422(b) criminalizes. In *Barlow* and *Broussard*, we clarified that § 2422(b) "does not require that the sexual contact occur, but that the defendant sought to persuade the minor to engage in that contact." *United States v. Broussard*, 669 F.3d 537, 548 (5th Cir. 2012) (quoting *Barlow*, 568 F.3d at 219 n.10) (internal quotation marks omitted). Put another way, as the First Circuit observed, "[§] 2422(b) criminalizes an intentional attempt to achieve a *mental* state—a minor's assent—regardless of the accused's intentions vis-à-vis the actual consummation of sexual activities with the minor." *United States v. Dwinnells*, 508 F.3d 63, 71 (1st Cir. 2007); *see also United States v. Bailey*, 228 F.3d 637, 639 (6th Cir. 2000) ("Congress has made a clear choice [in 18 U.S.C.

---

[5] *See also Hernandez–Galvan*, 632 F.3d at 200 ("[T]o the extent the 'substantial step' test requires an act that provides strong evidence of the actor's mental state, it might not criminalize some slight acts that go beyond mere preparation.").

§ 2422(b)] to criminalize persuasion and the attempt to persuade, not the performance of the sexual acts themselves.").

Howard argues that his actions—talking to an undercover police officer for less than a month without making flight or hotel reservations or agreeing on a specific date to meet in Corpus Christi—"can best be described as mere preparation." Howard relies on the Seventh Circuit's decision in *United States v. Gladish*, 536 F.3d 646, 649 (7th Cir. 2008) to support his view that a substantial step for purposes of § 2422(b) at least requires "setting up a definite meeting time and place, purchasing tickets or making hotel reservations, [or] driving to the proposed meeting place."

The government argues that Howard took a substantial step and points to the following evidence. Howard first corresponded with Detective Escobar after he offered "Cabrielez $5,000 if she could find children for sex." Howard sent Detective Escobar sexually explicit images of himself and instructed her to share them with "Brianna" and "Britany." He asked whether Detective Escobar "had shown the picture . . . to the girls and wanted to know their reaction." He directed Detective Escobar to obtain birth control for the girls, repeatedly demanded pictures of the girls, and instructed Detective Escobar to perform sex acts on the girls "to prepare them for him." The government relies on the Eleventh Circuit's decision in *United States v. Lee*, 603 F.3d 904, 915 (11th Cir. 2010) for the proposition that "[f]irm plans to travel" are not required if the defendant "took other steps sufficient to achieve the end that is the object of the attempt.'" *Lee*, 603 F.3d at 915.

### 1. Fifth Circuit Case Law

Prosecutions under 18 U.S.C. § 2422(b) ordinarily are the result of sting operations. The defendant discusses a specific meeting place with an undercover police officer posing as a minor (or a minor's parent). The

defendant shows up at the meeting place and is arrested.[6] We have had no trouble affirming these convictions finding that, by traveling to the meeting place, the defendant took a substantial step toward the commission of the crime strongly corroborative of intent. *See, e.g.*, *Barlow*, 568 F.3d at 219–20. For example, in *Barlow* we affirmed a conviction where the defendant agreed to meet the minor in a state park and "loaded his foster sons into the car with him and drove to the state park and waited for [the minor girl's] arrival," even though he left when he saw an FBI agent. *Id.* at 219. We explained that the defendant's "early departure does not undo the substantial steps he had already taken." *Id.* at 219–20.[7]

Travel to a meeting place is, therefore, sufficient to establish attempt. But we have never held that travel or plans to travel are necessary. *See Broussard*, 669 F.3d at 550 ("Broussard never traveled or made definitive plans to travel to meet TL and KH, but . . . we have never ruled that physical

---

[6] *See, e.g.*, *United States v. Caudill*, 709 F.3d 444, 445 (5th Cir.), *cert. denied*, 133 S. Ct. 2871 (2013) (affirming conviction where defendant's "online conversation culminated in an arrangement that Caudill would pay one hundred dollars in exchange for the officer providing the two girls, who would then perform sexual acts with Caudill. That evening, Caudill drove to the designated hotel but left when the officer failed to respond to text messages. Caudill was arrested shortly thereafter, and the police found condoms, a $100 bill, and diapers in his vehicle."); *United States v. Farner*, 251 F.3d 510, 511 (5th Cir. 2001) (affirming conviction where the defendant "confessed that he had traveled to Houston to meet Cindy [an FBI agent who represented herself as a 14-year-old girl]. He claimed that he had no specific plans with Cindy, but he would have done anything she wanted to do. He further admitted that he had planned to take her into his hotel room, and that he had discussed sex with her prior to traveling to Houston. A search of his hotel room revealed a box of condoms and a tube of surgilube lubricant.").

[7] Howard did not communicate with a minor. Indeed, "Britany" and "Brianna" never existed. Further, Howard communicated through an adult intermediary, Detective Escobar, who posed as the girls' mother. But that does not matter. The Fifth Circuit has held the nonexistence of the minor and communication through an adult intermediary are not viable defenses to criminal liability under § 2422(b). *Caudill*, 709 F.3d at 447 ("We join our sister circuits in holding that a defendant who communicates solely with an adult intermediary can be held to violate § 2422(b)."); *Farner*, 251 F.3d at 512–13 (rejecting the defendant's argument that "it was legally impossible for him to have committed the crime since the 'minor' involved in this case was actually an adult.").

proximity or travel or plans to travel is necessary to constitute a substantial step under § 2422(b).").  In *Broussard*, we explained that the Fifth Circuit has "never addressed whether obtaining a phone number and having conversations with a minor about meeting for illicit sexual activity constitutes a substantial step toward persuading a minor to engage in illicit sexual activity under § 2422(b)—nor has any intervening decision clarified the issue." *Id.*  On plain error review, we concluded that, therefore, "any error on the district court's part in accepting Broussard's plea on the factual basis established by the evidence could not be plain." *Id.*

This appeal presents the issue that we left open in *Broussard*.  What conduct—in the absence of travel or definite plans to travel—crosses the line from mere preparation to attempt to violate § 2422(b)?

## 2.  *The View of the Other Circuits*

Although the Fifth Circuit has not addressed this question, other circuits have.  The other circuit decisions, as discussed below, have held that there must be more than just explicit sex talk to support a § 2422(b) conviction.  These courts have upheld criminal convictions when the defendant and the minor victim (or victim's guardian) have at least began to make arrangements to meet.

For instance, the Ninth Circuit in *United States v. Goetzke*, 494 F.3d 1231 (9th Cir. 2007) (per curiam) affirmed a defendant's § 2422(b) conviction in the absence of travel.  There, a mother sent her developmentally disabled 10-year-old son to a Montana ranch owned by a family friend.  *Id.* at 1233.  A few days into the trip, the mother learned that the defendant—a registered sex offender with a sexual preference for young boys—was staying at the ranch as well.  *Id.*  Accordingly, the mother had a social worker put her son on a plane back to their home in Louisiana.  Upon the boy's return, the defendant began calling and writing the young boy, promising Nintendo 64 video games, making

explicit sexual overtures, and asking for pictures. *Id.* The mother turned the correspondence over to authorities, who posed as the boy and responded mimicking his writing style. *Id.* The defendant sent more sexual letters and proposed a meeting: "[S]oon school will be out. Are you going to come to Montana again? Maybe this summer?" *Id.* at 1233–34. After this letter, the police arrested the defendant.

The Ninth Circuit affirmed the conviction and reasoned that the defendant's sexual letters "essentially began to 'groom' [the minor victim] for a sexual encounter in the event he returned to Montana." *Id.* at 1235. This grooming behavior plus the defendant's specific discussions about travel and a proposed meeting crossed the line between preparation and attempt. *See id.* at 1237. The defendant "sent W letters replete with compliments, efforts to impress, affectionate emotion, sexual advances, and dazzling incentives to return to Montana, and proposed that W return during the upcoming summer. In short, [the defendant] made his move." *Id.* (footnote omitted). The court also noted that "[b]ecause Goetzke's letters proposed that W return to Montana, we need not decide whether an attempt to arrange a meeting is required to constitute a substantial step under § 2422(b)." *Id.* at 1237 n.5.

To our knowledge, the only circuit to reverse a § 2422(b) conviction is the Seventh Circuit in *United States v. Gladish*, 536 F.3d 646 (7th Cir. 2008). There, the government caught the defendant in a sting operation in which a government agent impersonated a 14-year-old girl in an internet chatroom. The exchanges were graphic, and the defendant sent a video of himself masturbating. The girl agreed to have sex with the defendant, and in a subsequent chat, he discussed the possibility of traveling to meet her in a couple of weeks, but no specific arrangements were made. *Id.* at 648.

The Seventh Circuit distinguished the Ninth Circuit's decision in *Goetzke* and reversed. *Id.* at 649–51. The court explained, "The substantial

13

step can be making arrangements for meeting the girl, as by agreeing on a time and place for the meeting." *Id.* at 649 (citations omitted). Further, "[i]t can be taking other preparatory steps, such as making a hotel reservation, purchasing a gift, or buying a bus or train ticket, especially one that is nonrefundable." *Id.* The court noted that this conclusion was consistent with the Ninth Circuit's decision in *Goetzke* and that the court would not "try to give an exhaustive list of the possibilities." *Id.* The court also noted that "[c]hild sex abuse is often effectuated following a period of 'grooming' and the sexualization of the relationship." *Id.* (quoting Sana Loue, *Legal and Epidemiological Aspects of Child Maltreatment*, 19 J. Legal Med. 471, 479 (1998)).

The Seventh Circuit rejected the government's argument that "the line runs between 'harmless banter' and a conversation in which the defendant unmistakably proposes sex." *Id.* at 649. The court reasoned that in all the cases that the government cited and that the court independently found "there was more than . . . [just] explicit sex talk." *Id.* "The *Goetzke* decision," the Seventh Circuit said, "goes the farthest in the direction of the government's opinion but is distinguishable." *Id.* "Because Goetzke and his intended victim had a prior relationship, his effort to lure the victim back to Montana could not be thought idle chatter." *Id.* at 650. "Treating speech (even obscene speech) as the 'substantial step' would abolish any requirement of a substantial step," and that requirement "serves to distinguish people who pose real threats from those who are all hot air." *Id.*

The Seventh Circuit's view in *Gladish*—that there must be more than just explicit sex talk, such as an arrangement to meet—appears to be consistent with the view of the other circuits. For example:

- The First Circuit affirmed a conviction under § 2422(b) and held that the defendant "actually meeting with the girl's father and discussing with him graphic sexual details and prices goes far beyond 'mere preparation.'" *United States v. Berk*, 652 F.3d 132, 140 (1st Cir. 2011).

No. 13-40767

- The Second Circuit affirmed a conviction concluding the defendant "took a 'substantial step' towards the completion of the crime because [he] actually went to the Port Authority bus terminal, the meeting place that he had established with 'Julie.'" *United States v. Brand*, 467 F.3d 179, 204 (2d Cir. 2006).

- The Third Circuit affirmed a conviction in which the defendant "arranged a rendezvous [on a specific date] for the sexual encounter and discussed ways to avoid police detection." *United States v. Nestor*, 574 F.3d 159, 161 (3d Cir. 2009).

- The Fourth Circuit affirmed a conviction where the defendant, "Engle[,] communicated with K.M. and C.M. in specific terms regarding his expected release from jail, his immediate plan to reunite with K.M., and his desired living arrangement in their house. Moreover, Engle referenced his past sexual activity with K.M. in graphic terms, and he unequivocally stated his intention to resume sexual activity with her as soon as he was released." *United States v. Engle*, 676 F.3d 405, 423 (4th Cir.), *cert. denied*, 133 S. Ct. 179 (2012).

- The Eighth Circuit upheld a conviction where the defendant said, "he just traveled to the meeting place 'out of curiosity' to see if there were television cameras. He admitted using Yahoo! to chat with the apparent minor. He admitted removing his photograph from his profile following his trip to the apartment. He said he never intended to have sex with a minor. A computer forensic analysis of Helder's desktop computer revealed that he had used MapQuest.com to search for 'lisa''s address and had accessed her Yahoo! profile." *United States v. Helder*, 452 F.3d 751, 752 (8th Cir. 2006).

- And the Eleventh Circuit upheld a conviction where the defendant "called Lynn on the telephone and, after hearing her voice, made arrangements to meet her so they could engage in sexual activity." *United States v. Yost*, 479 F.3d 815, 820 (11th Cir. 2007).

Other courts have affirmed convictions where the defendant did not actually make a definite plan to meet but proposed or began arranging a meeting. *See, e.g.*, *United States v. Thomas*, 410 F.3d 1235, 1246 (10th Cir. 2005) (upholding a conviction because the defendant "crossed the line from 'harmless banter' to inducement the moment he began making arrangements to meet angelgirl12yo, notwithstanding the lack of evidence that he traveled to

the supposed meeting place."); *United States v. Bailey*, 228 F.3d 637, 639–40 (6th Cir. 2000) (upholding a conviction where the "minor testified that [the defendant] e-mailed her his pager number and his private pin number for the pager and that he urged her to call him and arrange a meeting. [The victim], whose report prompted the investigation of [the defendant], testified that she became frightened when [the defendant] sent her a message identifying her hair color, what she had worn to school that day, and the time during which she ate lunch at school.").[8] Importantly, each of these decisions affirmed the conviction. In none of these cases did the court say "this is the outer limit—this far and no further."

The case that most supports the government's position is *United States v. Lee*, 603 F.3d 904 (11th Cir. 2010). The Eleventh Circuit in *Lee* held that "[w]e will not require firm plans to travel where, as here, the defendant, for several months, took other steps sufficient to achieve the end which is the object of the attempt." *Id.* at 915. *Lee* shares many factual similarities with the facts in this case. Both *Lee* and this case involve the undercover police officer–adult intermediary of two fictional underage girls.[9] Like Howard, the defendant in *Lee* sent photos of his penis to the undercover police officer, posing as the girls' mother, and asked that those photos be shared with the girls. *Id.* at 917. He also asked about the girls' reactions to the photos, demanded nude photographs of the girls, and pressed the undercover officer to procure birth control "because he is 'not a condom user.'" *Id.* He also invited the undercover

---

[8] There were three minor victims in *Bailey* and (it appears) only one count for violation of § 2422(b) involving all three victims. The opinion summarizes the evidence for all three victims, so it is unclear which evidence the court deemed sufficient. *See Bailey*, 228 F.3d at 639–40. That said, the court noted: "Several e-mails wherein [Bailey] proposed meeting the girls to perform oral sex were read into the record." *Id.* at 640.

[9] Communicating through an adult intermediary is not a defense to § 2422(b). *Caudill*, 709 F.3d at 447.

officer to watch a live video stream of him masturbating, ending the video by asking her to "send[] [his] lov[e]" to the girls. *Id.* Ultimately, the defendant in *Lee* was arrested on his front porch "excitedly accepting what he believed to be pornographic photographs of the minor girls." *Id.*

But *Lee* is different from this case in some important respects. Howard's correspondence with the undercover officer here was over the course of three weeks; whereas, the defendant in *Lee* communicated with the undercover officer there over the course of eleven months. *See id.* at 915. Unlike Howard, the defendant in *Lee* literally took a "step" to his front porch to accept delivery of what he believed to be pornographic pictures of the minor girls.

Moreover, we note that "grooming behavior" is a factor other courts have found significant in some cases. *See, e.g.*, *United States v. Chambers*, 642 F.3d 588, 593 (7th Cir. 2011) ("We recognize that child sexual abuse can be accomplished by several means and is often carried out through a period of grooming."); *Lee*, 603 F.3d at 915 ("Much of Lee's conduct—especially his sending graphic photographs to the girls and promising gifts—also supports a finding that he groomed the girls in an effort to facilitate a future sexual encounter."); *Goetzke*, 494 F.3d at 1235 ("The [defendant's] letters essentially began to 'groom' W for a sexual encounter in the event he returned to Montana."). The Seventh Circuit defined "grooming" as "deliberate actions taken by a defendant to expose a child to sexual material; the ultimate goal of grooming is the formation of an emotional connection with the child and a reduction of the child's inhibitions in order to prepare the child for sexual activity." *Chambers*, 642 F.3d at 593 (citing Sana Loue, *Legal and Epidemiological Aspects of Child Maltreatment*, 19 J. Legal Med. 471, 479 (1998)). The presence of grooming behavior is probative evidence that supports

17

the inference that the defendant intends to entice the minor to assent to illegal sex.[10]

### 3. Analysis

The case law from this circuit and our sister circuits supports the rule that grooming behavior plus other acts strongly corroborative of intent to entice illegal sex—such as detailed discussions to arrange a meeting with the minor victim—can suffice to establish a substantial step under § 2422(b).  *See, e.g.*, *Lee*, 603 F.3d at 915 ("We will not require firm plans to travel where, as here, the defendant, for several months, took other steps sufficient to achieve the end which is the object of the attempt."); *cf. Broussard*, 669 F.3d at 550 ("[W]e have never ruled that physical proximity or travel or plans to travel is necessary to constitute a substantial step under § 2422(b).").  For example, in *Goetzke*, the court affirmed the conviction where the defendant's sexual overtures essentially groomed the young boy for a sexual encounter, and held that this grooming behavior plus the defendant's proposed summer meeting in Montana and prior relationship with the minor together support the jury's conclusion that Goetzke took a substantial step.  494 F.3d at 1235–37.

Accordingly, we disagree with the district court's conclusion that Howard took a substantial step toward enticing a minor to engage in illegal sex simply by sending a sexually explicit photograph of himself and asking that it be shown to the girls.  *Gladish* and *Lee* are persuasive on this point.  In both cases the defendants sent video of themselves masturbating; the defendant in

---

[10] *Cf. United States v. Joseph*, 542 F.3d 13, 18 (2d Cir. 2008) (reversing and remanding on an erroneous jury instruction, reasoning: "[T]he offense remains 'enticing,' and making a sexual act 'more appealing' in the absence of an intent to entice is not a crime.  If jurors thought that Joseph only wanted to make 'Julie' think that sexual conduct with him would be appealing, but did not intend to entice her to engage in such conduct with him, they would have convicted him for having cybersex conversation, which is not a crime, but not for violating section 2242(b)." (footnote omitted)).

No. 13-40767

*Gladish* sent the video directly to an undercover agent whom he thought was a minor herself. But neither the Seventh Circuit in *Gladish* nor the Eleventh Circuit in *Lee* found that behavior alone was sufficient to affirm the convictions. *Gladish*, 536 F.3d at 651; *see Lee*, 603 F.3d at 916–18 (listing the defendant's having invited the undercover officer, posing as a minor's mother, to watch a live video stream of him masturbating as one of twenty-three pieces of evidence which, "'taken as a whole,' allowed the jury to find that Lee's conduct was criminal."). Thus, sending sexually explicit images and video is probative evidence of intent to entice a minor to engage in illegal sex. But we conclude this is not sufficient of itself to constitute a "substantial step."

We also reject Howard's argument that, under the Seventh Circuit's decision in *Gladish*, travel or a definite plan to travel is required to sustain a conviction under § 2422(b). Answering the question we left open in *Broussard*, we hold that travel or a definite plan to travel is not necessary to constitute a "substantial step" under § 2422(b). Our view is consistent with persuasive authority from our sister circuits. In *Goetzke*, the Ninth Circuit affirmed the defendant's conviction where the defendant proposed a summer meeting in Montana and lured the minor victim with "dazzling incentives" that "essentially began to 'groom'" the victim "for a sexual encounter." 494 F.3d at 1235, 1237. And in *Bailey*, the Sixth Circuit affirmed the defendant's conviction where the defendant "urged [the minor victim] to call him and arrange a meeting." 228 F.3d at 639–40.

Further, accepting Howard's proposed bright-line rule—requiring an unequivocal commitment, like purchasing a plane ticket—would allow internet predators to look for vulnerable targets and escape criminal liability by simply

19

No. 13-40767

avoiding concrete commitments through circumspection. We do not think that Congress—or the court in *Gladish*—intended that result.[11]

Here, we find that a reasonable trier of fact could conclude beyond a reasonable doubt that Howard's conduct approached the line between despicable lawful conduct and criminal attempt—through his sexually explicit conversations, transmission of sexual photographs, and discussion of specific travel details—and crossed it when he instructed the undercover police officer to perform sex acts on and procure birth control for the girls to get them ready for him. The district court reasonably credited Detective Escobar's testimony that this conduct constituted "grooming behavior." *Cf. Chambers*, 642 F.3d at 593 (defining "grooming behavior" as "deliberate actions taken by a defendant to expose a child to sexual material; the ultimate goal of grooming is the formation of an emotional connection with the child and a reduction of the child's inhibitions in order to prepare the child for sexual activity"). We view this evidence in the light most favorable to the bench trial verdict of guilt. Thus, a rational trier of fact could have found that Howard's "grooming

---

[11] We also reject Howard's invocation of the rule of lenity "to the extent there is any ambiguity in the 'attempt language'" in § 2422(b). "The rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them." *United States v. Santos*, 553 U.S. 507, 514 (2008) (Scalia, J., plurality opinion). The term "attempt" is not subject to competing interpretations. *Black's Law Dictionary* defines "attempt," as that term is used in criminal statutes, to mean: "An overt act that is done with the intent to commit a crime but that falls short of completing the crime. . . . Under the Model Penal Code, an attempt includes any act that is a substantial step toward commission of a crime . . . ." *Black's Law Dictionary* 146 (9th ed. 2009). Accordingly, "attempt" has acquired a common meaning in the provisions of the federal criminal code, and, as discussed above, federal courts consistently apply the Model Penal Code's definition. *Cf. Santos*, 554 U.S. at 511 (applying the rule of lenity in part because the term "proceeds" "has not acquired a common meaning in the provisions of the Federal Criminal Code."). We note our view is consistent with the view of the First Circuit. *See Dwinells*, 508 F.3d at 70 ("Because the rule of lenity applies only when the meaning of a criminal statute is genuinely uncertain, the rule simply does not pertain [to interpretation of 18 U.S.C. § 2422(b)]."). In short, the difficulty in applying the Model Penal Code's "substantial step" test to the facts in this case does not indicate the statute is ambiguous, so the rule of lenity has no application here.

behavior"—against the backdrop of Howard's conversations with Cabrielez[12] and together with his specific discussions about travel and transmittal of sexually explicit photographs with instructions they be shown to the girls—constituted a substantial step. *See Allen*, 587 F.3d at 256 ("[E]vidence is sufficient to sustain a conviction if any rational trier of fact could have found that the evidence established guilt beyond a reasonable doubt. This court examines the evidence as a whole and construes it in the light most favorable to the verdict." ).

We disagree with Howard's argument that this case is like *Gladish* because Howard "made no flight or hotel reservations for Corpus Christi, any agreement regarding a specific date to meet in Corpus Christi or any other travel arrangements." *Cf. Gladish*, 536 F.3d at 649 ("The substantial step can be making arrangements for meeting the girl, as by agreeing on a time and place for the meeting[,] [or] taking other preparatory steps, such as making a hotel reservation, purchasing a gift, or buying a bus or train ticket, especially one that is nonrefundable." (citations omitted)). *Gladish* is distinguishable. The discussions about travel in this case included Howard's statement that "he would definitely travel to Corpus Christi to have sex with [Detective Escobar's] daughter." Howard asked what airport he should fly into, mentioned he could fly Southwest Airlines, and inquired about specific hotels.

We find these detailed discussions more specific than the defendant's discussions about the mere "possibility of traveling to meet [the minor female] in a couple of weeks" in *Gladish*. *See* 536 F.3d at 648. Further, these discussions, importantly, occurred against the backdrop of Howard's earlier conversation with Cabrielez in which he offered her $5,000 to procure a

---

[12] As discussed above, Howard offered Cabrielez $5,000 to procure a 15-year-old girl for sex.

"quince," i.e., a fifteen-year-old girl.[13] Moreover, Howard not only sent sexually explicit photographs, he specifically instructed Detective Escobar to perform sex acts on, and procure birth control for, the minor girls. This conduct is consistent with grooming behavior and is different from the facts in *Gladish* in which the court found that "hot air is all the record shows." *Id.* We think Howard's "grooming behavior"—particularly instructing Detective Escobar to perform sex acts on and procure birth control for her minor daughters—plus his detailed travel discussions sufficiently distinguishes him "from those who are all hot air" and supports the verdict that he took a substantial step. *See id.* at 650.

That said, we find the government's conduct in the criminal investigation curious. Detective Escobar seemingly asked the defendant to "put up, or shut up": she asked Howard to commit to book a flight before she would let him talk to her minor daughters, "take it or leave it," and Howard responded, "okay, I'll leave it." Three months later—without Detective Escobar receiving any further contact from Howard—the police arrested the bedridden Howard at his girlfriend's home in California.

In light of the government's conduct, finding criminal attempt in this case is a close call, and we hope that this is the outer bounds of a case the government chooses to prosecute under § 2422(b). There is no single action by the defendant in this case that clearly signifies that the defendant would follow through on his sexual talk, "such as making a hotel reservation, purchasing a gift, or buying a bus or train ticket, especially one that is nonrefundable,"

---

[13] The Seventh Circuit in *Gladish* placed the defendant's conduct in *Goetzke* in context and noted that "[b]ecause Goetzke and his intended victim had a prior relationship, his effort to lure the victim back to Montana for sex could not be thought idle chatter." *Gladish*, 536 F.3d at 650. Here, Howard's request that Cabrielez procure a fifteen-year old for sex, viewed in the light most favorable to the verdict, supports the inference that Howard's later discussions with Detective Escobar were, similarly, not merely idle chatter.

*Gladish*, 536 F.3d at 649 (noting that the court would not "try to give an exhaustive list of the possibilities"), or even "accepting what he believed to be pornographic photographs of the minor girls," *Lee*, 603 F.3d at 917.   A discussion about price or a specific agreement would also be strong probative evidence.   *Cf. Berk*, 652 F.3d at 140 (holding that "actually meeting with the girl's father and discussing with him graphic sexual details and prices goes far beyond 'mere preparation.'").   Were we the triers of fact, we might reach a conclusion different from the district court in this case.

But the district court had the benefit in this case of listening to live testimony, including Howard's testimony explaining himself.   The court also listened to and evaluated numerous recordings revealing the tone and demeanor of the conversations between Detective Escobar and Howard.   On review of a bench trial verdict, our role is limited to determine whether the district court's finding of guilt is "supported by any substantial evidence." *Allen*, 587 F.3d at 256.   Having examined the evidence as a whole in the light most favorable to the verdict, we find that it is.[14]

## B.    Howard's Constitutional Challenges

Howard challenges the constitutionality of § 2422(b) on two grounds.   He asserts (1) that the term "attempt" is unconstitutionally vague and (2) that § 2422(b) is unconstitutionally overbroad because it criminalizes protected speech in violation of the First Amendment.   The government argues § 2422(b) is not unconstitutionally vague or overbroad, noting that the Second, Third,

---

[14] The role of the district judge is critical in these cases.   The court must take care to instruct juries to set aside their prejudices and to focus on the objective conduct of the defendant as part of a course of conduct planned to culminate in his commission of the crime. *See Oviedo*, 525 F.2d at 884–85 (the substantial step requirement "prevents the conviction of persons engaged in innocent acts on the basis of a mens rea proved through speculative inferences, unreliable forms of testimony, and past criminal conduct").   If the district judge is the fact finder, he or she must similarly find the facts based on the objective evidence.   We are confident the district court did that here.

Sixth, Ninth, Tenth, and Eleventh Circuits "have analyzed the statute and rejected similar constitutional challenges." We agree with the government.

First, we note that we review Howard's vagueness challenge for plain error because he did not present this issue to the district court. *See Knowles*, 29 F.3d at 950. In contrast, Howard presented his overbreadth challenge to the district court, so our review of that issue is de novo. *Clark*, 582 F.3d at 612.

Under basic principles of due process, a criminal statute is void for vagueness if the conduct it prohibits is not clearly defined. *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). To satisfy constitutional due process, "a penal statute [must] define the criminal offense [1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement." *Skilling v. United States*, 561 U.S. 358, 403 (2010) (alterations in original) (internal quotation marks omitted) (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)). "The overbreadth doctrine prohibits the Government from banning unprotected speech if a substantial amount of protected speech is prohibited or chilled in the process." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255 (2002).

Although the Fifth Circuit has not yet had occasion to address constitutional challenges to § 2422(b), the government is correct that the other circuits have unanimously upheld § 2422(b) over vagueness and overbreadth challenges.[15] For example, in *United States v. Hart*, the Sixth Circuit rejected

---

[15] *United States v. McMillan*, 744 F.3d 1033, 1036 (7th Cir. 2014) ("In the end, what is important under this statute is the defendant's attempt (using the mails or other instrumentalities of commerce) to persuade the minor. So read, there is nothing unconstitutionally vague about this law, contrary to McMillan's protestations. Ordinary people using common sense . . . will understand that § 2422(b) is violated by attempts to persuade, entice, coerce, or induce a minor to engage in sexual activity." (citations and internal quotation marks omitted)); *United States v. Gagliardi*, 506 F.3d 140, 147 (2d Cir. 2007) (rejecting the defendant's argument that § 2422(b) is unconstitutionally vague because

an overbreadth challenge to § 2422(b) because "(1) the statute applies only to persons who knowingly attempt to persuade minors to engage in sexual activity, and (2) a defendant 'does not have a First Amendment right to attempt to persuade minors to engage in illegal sex acts.'" 635 F.3d 850, 857 (6th Cir. 2011) (quoting *Bailey*, 228 F.3d at 639). Moreover, the Supreme Court has said in the First Amendment context that "[t]he prevention of sexual exploitation and abuse of children constitutes a government objective of surpassing importance." *New York v. Ferber*, 458 U.S. 747, 757 (1982) (upholding a New York statute that prohibits the distribution of hard core child pornography over a First Amendment overbreadth challenge). And in *United States v. Gagliardi*, 506 F.3d 140 (2d Cir. 2007), the Second Circuit rejected the defendant's argument that § 2422(b) was unconstitutionally vague because the word attempt is a "word[] of common usage that ha[s] [a] plain and ordinary meaning[]." *Id.* at 147. The court explained "the statute's terms are sufficiently definite that ordinary people using common sense could grasp the nature of the prohibited conduct." *Id.* The court also observed § 2422(b) "establishes the requisite minimal guidelines to prevent arbitrary or discriminatory enforcement in that it applies only to those who 'knowingly'

---

it does not define the term "attempt" because the term is "sufficiently definite that ordinary people using common sense could grasp the nature of the prohibited conduct"); *see also United States v. Hart*, 635 F.3d 850, 858 (6th Cir. 2011) (rejecting vagueness challenge because "the term 'persuade' in 18 U.S.C. § 2422(b) has an ordinary meaning that is not subject to ambiguity"); *United States v. Tykarsky*, 446 F.3d 458, 473 (3d Cir. 2006) ("[W]e also conclude that § 2422(b) is not unconstitutionally vague. Although § 2422(b) does not define the terms 'persuade,' 'induce,' 'entice' and 'coerce,' they 'have a plain and ordinary meaning that does not need further technical explanation.'"); *United States v. Thomas*, 410 F.3d 1235, 1244 (10th Cir. 2005) ("Section 2422(b) requires only that the defendant intend to entice a minor, not that the defendant intend to commit the underlying sexual act. Contrary to Thomas's assertions, this interpretation does not render the statute unconstitutionally overbroad or void for vagueness."); *United States v. Panfil*, 338 F.3d 1299, 1301 (11th Cir. 2003) (per curiam) (rejecting vagueness challenge because "[s]ection 2242(b) suffers from no such constitutional infirmity. The words 'entice' and 'induce' are not ambiguous or subject to varying standard . . . . Indeed, the language of § 2422(b) is clear." (citation omitted)).

engage in the prohibited conduct." *Id.* (citation omitted) (citing *Kolender*, 461 U.S. at 358). "This scienter requirement," the court explained, "narrows the scope of § 2422(b) as well as the ability of prosecutors and law enforcement officers to act based on their own preferences." *Id.*

We find this authority persuasive. As discussed briefly above,[16] the term "attempt" has acquired an ordinary, definite, and plain meaning in the criminal context. *See Black's Law Dictionary* 146 (9th ed. 2009). Further, § 2422(b)'s scienter requirement sufficiently constrains government discretion. *See Kolender*, 461 U.S. at 358; *Gagliardi*, 506 F.3d at 147. In the absence of Fifth Circuit authority to the contrary, and in light of the unanimous persuasive authority upholding the constitutionality of § 2422(b), Howard has not shown that any error on the vagueness issue was plain. *See United States v. Clark*, 582 F.3d 607, 614 (5th Cir. 2009) (rejecting a vagueness challenge because the defendant did not "show that an ordinary person cannot understand what conduct [the statute] prohibits or that the statute encourages arbitrariness and discrimination by law enforcement").

We reach the same conclusion with respect to Howard's overbreadth challenge. Here, Howard has not shown that, viewing the evidence in the light most favorable to the prosecution, he was engaged in protected speech. The judge, sitting as trier of fact, found that he knowingly attempted to persuade minors to engage in illegal sex acts. As the Sixth and Eleventh Circuits have observed, "[s]peech attempting to arrange the sexual abuse of children is no more constitutionally protected than speech attempting to arrange any other type of crime." *United States v. Hornaday*, 392 F.3d 1306, 1311 (11th Cir. 2004); *see also Ferber*, 458 U.S. at 764 ("When a definable class of material . . . bears so heavily and pervasively on the welfare of children engaged in its

---

[16] *See supra* note 11.

production, we think the balance of competing interests is clearly struck and that it is permissible to consider these materials as without the protection of the First Amendment."). Thus, we agree with our sister circuits and hold that § 2422(b) is not unconstitutionally overbroad because it does not criminalize protected speech in this case.

## IV.  CONCLUSION

For the foregoing reasons, we AFFIRM.