# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

September 16, 2025

Lyle W. Cayce
Clerk

———————————

No. 24-30377

———————————

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

ROBERT HALL,

*Defendant—Appellant*,

CONSOLIDATED WITH

———————————

No. 24-30427

———————————

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

MICHAEL CONNER,

*Defendant—Appellant*.

———————————————————————

Appeals from the United States District Court
for the Eastern District of Louisiana
USDC Nos. 2:23-CR-54-2, 2:23-CR-54-1

———————————————————————

Before Haynes, Ho, and Oldham, *Circuit Judges*.

Per Curiam:[*]

These consolidated cases involve convictions under 18 U.S.C. § 922(g)(1) for possession of a firearm by a felon. Before the district court, Defendants sought to suppress evidence of the guns found in their possession by arguing that the police lacked proper justification to stop and detain them. The district court denied the motions, and Defendants were ultimately convicted under § 922(g)(1). They now appeal, challenging their convictions and the district court's order denying their motions to suppress. We AFFIRM.

## I. Background

Robert Hall and Michael Conner were indicted for possession of a firearm by a convicted felon. They moved to dismiss the charges, arguing that § 922(g)(1) was unconstitutional in view of *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). The district court denied the motions to dismiss their indictments.

In addition, Hall and Conner filed motions to suppress evidence that they were carrying firearms seized during the stop. The district court held two joint evidentiary hearings on the suppression motions.

At the first hearing, the government presented the following evidence. The New Orleans Police Department uses a network of crime cameras installed throughout the city. Detective Chad Cockerham testified that he was a surveillance officer who provided information for the SWAT team to investigate. He also testified that, based on statistics concerning calls

---

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

received by the police department, the area where the relevant events occurred was a high crime area, involving shootings and drug activity. He began conducting surveillance in this area about two weeks before the arrests at issue.

On February 18, 2023, Cockerham observed a man, later identified as Hall, remove a firearm from his waistband and place it on the ground—a few feet away from a young child—while playing dice. The next day, he observed others involved in what appeared to him to be a hand-to-hand drug transaction in the same area. These two incidents occurred during Mardi Gras, and there were no units available to respond.

Cockerham continued surveilling the area on March 7, 2023. He observed Hall, Conner, and a man later identified as Joseph Pomfrey. He noticed that Pomfrey had a handgun in his right pocket with the magazine protruding; Pomfrey later took the weapon from his right pocket and put it into a bag that was draped across his body. Cockerham called the SWAT team to conduct an investigatory stop of Pomfrey. At the hearing, the government presented the crime camera video showing that another person in a pink shirt passed a firearm to Hall, but Cockerham did not notice this exchange at the time he was conducting surveillance. The video also shows Hall put the firearm into his right pocket.

Cockerham testified that he next observed the men get up and walk around the corner. He noted that Conner had a large, heavy object swinging back and forth in the right pocket of his sweatpants. When he zoomed in, he could see that the object was L-shaped and he believed that it was a firearm based on his training and experience. Cockerham noticed that Conner was holding a phone in his hand, which led him to believe that the object in his pocket was not a phone. He explained that carrying a firearm in your pocket is dangerous because it could discharge at any time, that gun safety courses

teach people how to carry firearms safely, and that Conner probably did not have a concealed carry permit because he was carrying the firearm unsafely in his pocket. In his experience making hundreds of arrests for carrying a concealed weapon, Cockerham had never encountered anyone who had a concealed carry permit.

Additionally, Cockerham testified that he recognized Hall as the person who he saw in possession of a firearm in front of the same house a few weeks earlier. He advised the SWAT team that Hall possessed a weapon at this location a few weeks earlier and could be armed. He explained that when the SWAT team confronts a group potentially engaged in criminal activity, they detain everyone in the group and pat everyone down to ensure that they are not armed or a danger to the SWAT team. Cockerham testified that Officers Aaron Muse and Carey Jordan frisked and ultimately handcuffed Hall. According to Cockerham, Jordan conducted the frisk and immediately found a firearm; Jordan then removed the firearm, and Muse handcuffed Hall. He further testified that Hall did not declare that he had a concealed weapon on him or that he had a concealed carry permit, as permit holders are advised to do in training. After the officers ran the men's names through CASTnet, their in-car database, they learned that Hall and Conner were prohibited from possessing firearms because they had prior felony convictions. CASTnet was not equipped to determine whether someone has a concealed carry permit.

Officer Arden Taylor, a SWAT team member who responded to the call, testified that he had arrested over 100 people for carrying a concealed weapon and that of those arrests, only one person had a concealed carry permit. When the SWAT team arrived, Taylor approached Conner, frisked his right side where the gun was thought to be, and felt a gun. Conner did not say that he had a concealed carry permit. After Taylor found the gun, he handcuffed Conner and ran his name through CASTnet. Taylor discovered

Conner's criminal history and placed him under arrest for possession of a firearm by a convicted felon.

At the second hearing, Muse testified that Cockerham called and advised his SWAT unit that two individuals were armed with firearms. Muse approached Hall and observed a bulge in his right pocket; when he got closer, he could see the butt of a gun inside Hall's pocket. He then started to frisk around his right pocket. Muse testified that Hall was frisked and handcuffed almost simultaneously. He then obtained Hall's name and searched CASTnet to determine whether Hall was a convicted felon. He testified that if a person has a felony conviction, he is ineligible for a concealed carry permit.

After the evidentiary hearings, the district court denied the suppression motions in a joint order. Hall and Conner entered conditional guilty pleas, reserving their right to appeal the district court's denial of their motions to dismiss and suppress. Hall and Conner timely appealed, and we consolidated the appeals before briefing began.

## II.    Jurisdiction

The district court had jurisdiction over this criminal proceeding under 18 U.S.C. § 3231. We have appellate jurisdiction over the final judgment under 28 U.S.C. § 1291.

## III.    Discussion

### A. Motions to Suppress

We start with Defendants' motions to suppress. When reviewing the denial of a motion to suppress, we review questions of law de novo and factual findings for clear error. *United States v. Smith*, 952 F.3d 642, 646 (5th Cir. 2020). We view the evidence in the light most favorable to the prevailing party (here, the government) and can affirm the ruling "if there is any

reasonable view of the evidence to support it." *Id.* (citation omitted). When a district court has denied a suppression motion after hearing live testimony, "the clearly erroneous standard is particularly strong because the judge had the opportunity to observe the demeanor of the witnesses." *United States v. Bass*, 996 F.3d 729, 736–37 (5th Cir. 2021) (citation omitted).

"[T]he legality of police investigatory stops is tested in two parts." *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (en banc). We "first examine whether the officer's action was justified at its inception, and then inquire whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop." *Id.*

### i.   The Initial Stop

A police officer can conduct a brief investigative stop (a *Terry* stop), if there is "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Navarette v. California*, 572 U.S. 393, 396 (2014); *see Terry v. Ohio*, 392 U.S. 1, 21–22 (1968). "[R]easonable suspicion exists when the officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure." *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005). "Although a mere 'hunch' does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Kansas v. Glover*, 589 U.S. 376, 380 (2020) (citation omitted). The standard has been described as requiring "some minimal level of objective justification." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (citation omitted). The government bears "the burden of proving the validity of a warrantless search by a preponderance of the evidence." *United States v. Conlan*, 786 F.3d 380, 387 (5th Cir. 2015).

6

After the district court denied Defendants' motions to suppress, we decided *United States v. Wilson*, 143 F.4th 647 (5th Cir. 2025). There, we held that police cannot "*Terry* stop a citizen based *solely* on the fact that he is carrying a concealed firearm." *Id.* at 651. We nevertheless upheld the *Terry* stop at issue in that case on other grounds. *Id.* For the reasons that follow, we do the same here.

The events at issue in *Wilson*, as in this case, took place during a time when Louisiana law prohibited the "intentional concealment of any firearm, or other instrumentality customarily used or intended for probable use as a dangerous weapon, on one's person." *Id.* at 655–56 (quoting La. Stat. Ann. § 14:95(A)(1)(a)).[1] That prohibition, however, did "not apply to a person with a valid concealed handgun permit." *Id.* § 14:95(A)(1)(b).

The officers had reasonable suspicion that the Defendants were carrying firearms in violation of Louisiana law. Reasonable suspicion exists if "the police officer can point to specific and articulable facts indicating that criminal activity is occurring or is about to occur." *United States v. Alvarado-Zarza*, 782 F.3d 246, 249 (5th Cir. 2015) (citation omitted). And there were plenty of such facts here. Cockerham observed, on video, Hall take a concealed handgun from his waistband and place it on the sidewalk in reach of a small child. Hall then engaged in a prolonged dice game, while the child sat and played beside the weapon. Later, Cockerham observed what appeared to be a hand-to-hand drug transaction in the same area. And the day of the arrest in question, Cockerham observed young men congregating on a stoop in approximately the same area, at least one of whom was armed. Cockerham then saw a group of these individuals, including Conner, walk

---

[1] As of July 2024, people over the age of 18 can now legally carry a concealed weapon without a permit, license, or safety training, subject to certain restrictions. La. Stat. Ann. § 14:95(M).

towards the residence where Hall had been shooting dice. These facts all suggested "criminal activity may be afoot," which is enough to give rise to reasonable suspicion. *United States v. Pack*, 612 F.3d 341, 356 (5th Cir.), *opinion modified on denial of reh'g,* 622 F.3d 383 (5th Cir. 2010).

Although we rejected in *Wilson* a per se presumption that a person is illegally carrying a firearm, here, the officers "point[ed] to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure." *Lopez-Moreno*, 420 F.3d at 430. The initial stop was therefore lawful.

### ii.    *The Scope of the Stop*

Next, Defendants argue that the officers exceeded the scope of the investigatory stop.

To the extent Defendants contend that the police officers acted unlawfully by frisking and handcuffing them during the stop, we disagree. "In order to ensure their safety during the stop, police may frisk the subject for weapons that they reasonably suspect he may carry." *United States v. Scroggins*, 599 F.3d 433, 441 (5th Cir. 2010). "Further, when someone engages in suspicious activity in a high crime area, where weapons and violence abound, police officers must be particularly cautious in approaching and questioning him." *United States v. Thomas*, 997 F.3d 603, 614 (5th Cir. 2021) (citation modified). Officers are "authorized to take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *Id.* at 615 (alteration in original) (quoting *United States v. Hensley*, 469 U.S. 221, 235 (1985)). Given the previously discussed reasonable suspicion that Defendants were illegally armed and the officers' testimony that the stop occurred in a high crime area, the officers' decision to frisk and handcuff Defendants was lawful.

Defendants also assert that the subsequent investigation was not adequately related to the circumstances justifying the stop. "[A] detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop, unless further reasonable suspicion, supported by articulable facts, emerges." *Brigham*, 382 F.3d at 507. Here, Defendants remained detained while the officers searched their names on CASTnet, the officers' in-car computer system. According to Defendants, this was outside the scope of the purpose of the stop because that system does not identify concealed-carry permitholders. But the system can alert officers to prior criminal history, and the officers knew that convicted felons were ineligible for concealed-carry permits at that time in Louisiana. LA. STAT. ANN. § 40:1379.3(C)(6). We therefore conclude that the officers acted lawfully in pursuing their investigation while Defendants remained detained.

In sum, with respect to the denial of Defendants' motions to suppress, we AFFIRM.

## B. Convictions under § 922(g)(1)

We now turn to the constitutional challenges to Defendants' convictions.[2] We review challenges to the constitutionality of a criminal statute de novo. *United States v. Howard*, 766 F.3d 414, 419 (5th Cir. 2014).

Hall's as-applied challenge to his § 922(g)(1) conviction is foreclosed by *United States v. Diaz*, 116 F.4th 458 (5th Cir. 2024), *cert. denied*, 2025 WL 1727419 (U.S. June 23, 2025), and *United States v. Schnur*, 132 F.4th 863 (5th Cir. 2025). In *Diaz*, we held that disarming a defendant who had been convicted of car theft fit within our Nation's history of regulating firearms. 116 F.4th at 472 ("At the time of the Second Amendment's ratification,

---

[2] As Defendants acknowledge, their facial challenges are foreclosed, so we address only their as-applied challenges.

those . . . guilty of certain crimes—like theft—were punished permanently and severely. And permanent disarmament was a part of our country's arsenal of available punishments at that time."). In *Schnur*, we held that *Diaz* forecloses as-applied challenges to other theft-related felony convictions, like robbery. 132 F.4th at 870–71 & n.5. Hall's predicate felony was robbery, so his as-applied challenge to § 922(g)(1) fails.

Conner's as-applied challenge to his § 922(g)(1) conviction is foreclosed by *United States v. Kimble*, 142 F.4th 308 (5th Cir. 2025). There, we held that "(g)(1) is constitutional as applied to defendants with predicate felonies for drug-trafficking offenses because of the intrinsic violence of the drug trade." *Id.* at 312. Because one of Conner's predicate felonies is a drug-trafficking offense (possession of marijuana with intent to distribute), his § 922(g)(1) challenge likewise fails.

## IV.    Conclusion

For the reasons above, we AFFIRM the Defendants' convictions and the denial of their motions to suppress.[3]

---

[3] We also DENY Defendants' joint motion to compel disclosure of *Brady* and *Giglio* information and for supplemental briefing, which they filed under seal. Assuming arguendo that *Brady* and *Giglio* apply in this procedural posture, we are not convinced that the information at issue meets the materiality requirement. *See United States v. Martinez-Perez*, 941 F.2d 295, 301 (5th Cir. 1991) (per curiam). All motions are DENIED.