# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 13-50842

United States Court of Appeals
Fifth Circuit

**FILED**

May 14, 2015

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

versus

JOSHUA CONLAN, Also Known as Joco,

Defendant–Appellant.

Appeals from the United States District Court
for the Western District of Texas

Before SMITH, PRADO, and OWEN, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

A jury found Joshua Conlan guilty of stalking a television news reporter ("JMP") and her husband ("JP") in violation of 18 U.S.C. § 2261A. He raises ten issues on appeal, involving sufficiency of the evidence; unconstitutional vagueness; double jeopardy; suppression of evidence; withdrawal and substitution of counsel; denial of self-representation; juror misconduct; speedy trial violations; and sentencing. We affirm.

## I.

Conlan and JMP dated as teenagers but had no further contact until

JMP appeared on national news networks several years later. Conlan sent her a flirtatious Facebook message; she responded politely but made it plain that she was not interested in him romantically. He then sent a large bouquet of flowers to her workplace with a note reading, "The next time our paths cross, I will not know hesitation." Worried about her safety, JMP sought help from local police and, at an officer's suggestion, sent Conlan an email explaining that she did not want any communication from him.

Conlan then began an escalating, year-long campaign of email, text-message, social-media, telephonic, and face-to-face contact with JMP, her family, work colleagues, and church members. Many of the messages were hateful, threatening, and graphically sexual. JMP repeatedly asked Conlan's brothers to intervene. That effort was unsuccessful, and Conlan accused JMP and JP of violating his privacy, "not something [he would] take lightly," and if she did not "straighten out this s--t in person," he would "be forced to return the favor." He told her that "things would get worse" and asked her to "send [him] a pretty picture once a week, that would keep [him] under control . . . ." He sent a package to her workplace containing a cellphone that had lip marks on the screen. He also sent her a single-line email reciting her home address and repeatedly told her to kill herself.

The messages did not stop after Detective Michael King told Conlan that his communications were unwelcome and that he would be arrested if he came to Austin, Texas, where JMP and JP resided. Instead, Conlan sent JMP a message that read, "You know what? I can come to you. Can Austin's finest brave that?"

Conlan also sent messages to JP, a professional musician. He commented, on a blog post about JMP's work, that he could not "wait for chicken head hunting in Texas" and that he was "[g]oing to be in every little bitch music

No. 13-50842

shop every weekend every night until I find the right chicken head." He sent JP a Facebook message asking, "Are you scared, princess?" and messages to JMP stating, "I was thinking about beating the s--t out of princess" and, "Doesn't princess want a face-to-face confrontation?" Conlan disparaged JMP in emails to the leadership of her church and went to her parents' house asking to see her.

Shortly thereafter, Conlan drove from Missouri to JMP and JP's house. As JP was driving from their residence, he saw a white vehicle with Missouri plates moving slowly and recognized Conlan as the driver. Conlan went around the block and passed JP a second time. Fearing that that he would be attacked, JP called the police and went to a police substation. Conlan was arrested at a nearby motel pursuant to a warrant; in his motel room, police found cellphones that had been used to call JMP's workplace and obtain directions to her house, and a laptop that contained Internet searches for her name. A loaded handgun and riot stick were found in Conlan's vehicle.

## II.

Conlan was indicted on three counts of interstate stalking in violation of 18 U.S.C. § 2261A. The district court found him incompetent to stand trial and ordered him committed to the custody of the Attorney General.[1] The court later found him competent, and a grand jury returned a superseding indictment with the same three counts: violations of § 2261A(2) as to JMP (Count One) and JP (Count Three), and § 2261A(1) (Count Two). A jury found Conlan guilty of all charges, and he was sentenced to ninety-six months of imprisonment and three years of supervised release.

---

[1] Conlan appealed his detention, and we dismissed the case as moot. *See United States v. Conlan*, 520 F. App'x 246, 247 (5th Cir. 2013) (per curiam) (finding that Conlan was detained under an unchallenged detention order).

No. 13-50842

III.

Conlan challenges the sufficiency of evidence from which a jury could conclude that he acted "with the intent to kill, injure, harass, intimidate, or place under surveillance with the intent to kill, injure, harass, or intimidate" JMP, as required by § 2261A. We "review[] the record to determine whether, considering the evidence and all reasonable inferences in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[2]

Intent is often established by inference from circumstantial evidence. *See United States v. Pruett*, 681 F.3d 232, 239 (5th Cir. 2012) (per curiam). The increasingly ominous tone and content of his messages reveal Conlan's desire to subject JMP to unwanted sexual acts, for her to die, and for a violent confrontation with JP and police. Instead of desisting when told to do so by JMP, his family, and the police, Conlan escalated his behavior by contacting JMP's colleagues, church leaders, and father, culminating in an interstate trip to her house armed with a handgun and riot stick.[3] There was sufficient evidence for a rational jury to conclude beyond a reasonable doubt that Conlan acted with the requisite intent.[4]

IV.

Conlan maintains that 18 U.S.C. § 2261A is unconstitutionally vague because neither "harass" nor "intimidate" is defined. We review that "challenge for plain error because he did not present [it] to the district court."

---

[2] *United States v. Vargas-Ocampo*, 747 F.3d 299, 303 (5th Cir.) (en banc), *cert. denied*, 135 S. Ct. 170 (2014).

[3] Although Conlan maintains that the gun and riot stick should have been suppressed, that evidence was properly before the jury, as explained *infra*.

[4] Conlan's sole authority, *United States v. Infante*, 782 F. Supp. 2d 815 (D. Ariz. 2010), involved significantly more benign facts.

4

*United States v. Howard*, 766 F.3d 414, 428 (5th Cir. 2014). A penal statute is unconstitutionally vague "if the conduct it prohibits is not clearly defined." *Id.* "To satisfy constitutional due process, 'a penal statute [must] define the criminal offense [1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement.'"[5] As every court of appeals to consider the question has held, § 2261A satisfies both of those requirements.[6]

The statute need not define "harass" and "intimidate" because they are not obscure words and are readily understandable by most people.[7] Any vagueness concerns are further alleviated by the list of easily understood terms surrounding "harass" and "intimidate"—"kill, injure . . . or cause substantial emotional distress"—and by the statute's scienter requirement, which narrows its scope and mitigates arbitrary enforcement.[8]

Conlan's fear that § 2261A criminalizes "otherwise legal actions—such

---

[5] *Howard*, 766 F.3d at 428 (alterations in original) (quoting *Skilling v. United States*, 561 U.S. 358, 403 (2010)).

[6] *See United States v. Osinger*, 753 F.3d 939, 944–45 (9th Cir. 2014); *United States v. Shrader*, 675 F.3d 300, 309–12 (4th Cir. 2012); *United States v. Bowker*, 372 F.3d 365, 380–83 (6th Cir. 2004), *vacated*, 543 U.S. 1182, *reinstated in relevant part*, 125 F. App'x 701 (6th Cir. 2005); *see also United States v. Sayer*, 748 F.3d 425, 433–36 (1st Cir. 2014) (rejecting a facial and as-applied First Amendment challenge to § 2261A(2)(A)); *United States v. Petrovic*, 701 F.3d 849, 854–56 (8th Cir. 2012) (same).

[7] *See Shrader*, 675 F.3d at 310 ("Most people would readily understand the former to mean 'to disturb persistently; torment, as with troubles or cares; bother continually; pester; persecute,' and the latter to mean 'to make timid; fill with fear.'" (quoting *Random House Dictionary of the English Language* 870, 1000 (2d ed. 1987))); *Bowker*, 372 F.3d at 381 ("[T]he meaning of ['harass' and 'intimidate'] 'can be ascertained fairly by reference to judicial decisions, common law, dictionaries, and the words themselves because they possess a common and generally accepted meaning.'" (quoting *Staley v. Jones*, 239 F.3d 769, 791–92 (6th Cir. 2001))).

[8] *See Shrader*, 675 F.3d at 311; *Osinger*, 753 F.3d at 945–47; *see also Howard*, 766 F.3d at 429–30 (rejecting a vagueness challenge to a criminal statute and recognizing that a scienter requirement narrows its scope and limits arbitrary enforcement).

as sending a letter or traveling from one state to another . . . even if some of those actions were undertaken without any ill intent" is unfounded.  As a preliminary matter, he cannot rely on hypothetical vagueness arguments because § 2261A "clearly proscribed" his year-long campaign of escalating sexual innuendo, threats of physical violence, and unwanted contacts with JMP's family, friends, and colleagues, culminating in an interstate trip to his victims' house.[9]  Furthermore, the statute defines "course of conduct" as "a pattern of conduct composed of 2 or more acts, evidencing a continuity of purpose." 18 U.S.C. § 2266(2).  That makes clear that the statute's intent requirement "modifies the cumulative course of conduct as a whole," *Shrader*, 675 F.3d at 311, and "avoids sweeping up innocent acts," *id.* at 312.

Moreover, unlike the restriction on wearing "a mask with the intent to intimidate, threaten, abuse or harass any other person" at issue in *Church of the American Knights of the Ku Klux Klan v. City of Erie*, 99 F. Supp. 2d 583, 591 (W.D. Pa. 2000) (internal quotation marks omitted), on which Conlan relies, § 2261A does not criminalize constitutionally protected free expression. To violate the statute one must both intend to cause victims serious harm and in fact cause a reasonable fear of death or serious bodily injury.  *See Shrader*, 675 F.3d at 310.  That combination of "intent and effect" distinguishes § 2261A from "the ordinance in *Ku Klux Klan*, which did not require that the harassment or intimidation result in any particular type of reaction in the audience."

---

[9] *See United States v. McRae*, 702 F.3d 806, 837 (5th Cir. 2012) ("A person whose conduct is clearly proscribed by a statute cannot . . . complain that the law is vague as applied to the conduct of others."); *see also Osinger*, 753 F.3d at 945 (concluding that defendant's "unrelenting harassment and intimidation . . . was not based on conduct that he 'could not have known was illegal'" (quoting *United States v. Kilbride*, 584 F.3d 1240, 1256 (9th Cir. 2009))); *Sayer*, 748 F.3d at 436 n.10; *Shrader*, 675 F.3d at 312; *Bowker*, 372 F.3d at 383 (deciding that defendant's "campaign of threatening and harassing conduct" toward news reporter, including after FBI agent warned him to stop, "clearly fell within the statute's prohibition").

No. 13-50842

*Bowker*, 372 F.3d at 382. Conlan has not shown, on plain-error review, that § 2261A is unconstitutionally vague.

V.

Conlan contends that his sentences on Counts One and Three violate the Double Jeopardy Clause because "the alleged course of conduct [for both offenses is] identical." "We review defendant's contention of multiplicitous sentences, which involves an issue of double jeopardy, for plain error." *United States v. Dixon*, 273 F.3d 636, 642 (5th Cir. 2001). Sentences are multiplicitous where a defendant "receive[s] more than one sentence for a single offense."[10] The analysis begins by identifying the statute's "unit of prosecution," relying in the first instance on the statutory language. *See id.* If the unit of prosecution is uncertain, "ambiguity should be resolved in favor of lenity." *Bell v. United States*, 349 U.S. 81, 83 (1955).

The plain language of § 2261A(2) "unambiguously contemplate[s] that the unit of prosecution is the targeted individual, requiring that the defendant act with intent towards a particular 'person,' that his actions produce the requisite effect in 'that person,' and defining punishment [in § 2261(b)(1)–(3)] in terms of the effect on 'the victim.'" *Shrader*, 675 F.3d at 313–14. Citing this court's precedent, the *Shrader* panel found further support for its conclusion because the *Blockburger*[11] test was not violated—the government needed to "prove different intents to harm two victims to convict the defendant on the two separate counts."[12] Conlan's analogies to other criminal statutes are

---

[10] *Dixon*, 273 F.3d at 641 (quoting *United States v. Galvan*, 949 F.2d 777, 781 (5th Cir. 1991) (internal quotation marks omitted)).

[11] *Blockburger v. United States*, 284 U.S. 299, 304 (1932).

[12] *Shrader*, 675 F.3d at 314 (citing *United States v. Swaim*, 757 F.2d 1530, 1536–37 (5th Cir. 1985)).

7

No. 13-50842

unavailing because, unlike § 2261A(2), those statutes were ambiguous.[13]  His comparison to *United States v. Lilly*, 983 F.2d 300, 303 (1st Cir. 1992), is equally unhelpful because that case involved a "unitary scheme" to defraud "a single bank," but Conlan intended to harass two different victims.  Conlan has not shown plain error in the imposition of separate sentences for Counts One and Three.

## VI.

Conlan avers that evidence recovered from his motel room and car should have been suppressed.  "When reviewing a . . . denial of a . . . motion to suppress, we accept as true the district court's factual findings unless clearly erroneous and we consider all questions of law *de novo*."  *United States v. McKinnon*, 681 F.3d 203, 207 (5th Cir. 2012) (per curiam).  "The evidence and inferences therefrom are reviewed in the light most favorable to the [g]overnment as the prevailing party."  *Id.*  The government has the burden of proving the validity of a warrantless search by a preponderance of the evidence.  *Id.* We may affirm the ruling on any ground supported by the record.  *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005).

## A.

After JP contacted the police, a bulletin was issued stating that Conlan was wanted on a harassment warrant; was potentially armed and mentally unstable; and was seen driving a white Honda with Missouri plates near the home of the victim, who had been placed in protective custody.  Officers saw Conlan's vehicle at a motel, and they had a manager call him to the front desk,

---

[13] *See id.* (distinguishing cases cited by Conlan—*Bell* and *Ladner v. United States*, 358 U.S. 169 (1958)—because the lenity concerns animating those decisions were inapplicable to § 2261A(2), whose "statutory scheme" speaks "clearly and without ambiguity" (quoting *Bell*, 349 U.S. at 84) (internal quotation marks omitted)).

where he was arrested. An officer then asked Conlan whether he wanted to get anything from his room before being taken to the station. He answered affirmatively, and officers accompanied him to the room and did a protective sweep. At Conlan's request, they retrieved his wallet. His laptop and two cellphones, described as "on the bed" and "in plain view" by the officers, were also taken.

The district court found that the laptop and cellphones were properly seized under the plain-view doctrine, which allows for "a seizure if (1) the officers lawfully entered the area where the items could be plainly viewed; (2) the incriminating nature of the items was immediately apparent; and (3) the officers had a lawful right of access to the items." *Waldrop*, 404 F.3d at 368. Conlan maintains that the officers were not lawfully present because "they created a situation [*sic*] where [he] woud [*sic*] necessarily be without his effects, and . . . basically forced [him] into requesting a return to his room." He does not elaborate on that argument, and the record does not support it. Had the officers wanted access to his room they could have executed the arrest warrant there, and nothing suggests that Conlan was pressured into returning to his room. Under *Washington v. Chrisman*, 455 U.S. 1, 7 (1982), it was permissible for the officers to accompany Conlan to his room and seize evidence in plain view.[14]

Conlan urges that the second prong of the plain-view doctrine was not satisfied because "phones and laptops are used everywhere," and there was "nothing inherently incriminating about a cellphone or a laptop in a hotel room." As a threshold matter, the governing standard demands not that items

---

[14] Nothing in *Chrisman* suggests that it was improper for the officers to ask whether Conlan wanted to get anything from his room, as distinguished from Conlan's making the inquiry. *See United States v. Harness*, 453 F.3d 752, 756 (6th Cir. 2006); *United States v. Garcia*, 376 F.3d 648, 651 (7th Cir. 2004).

No. 13-50842

be "inherently incriminating," but that their incriminating nature be "immediately apparent."[15]   "The incriminating nature of an item is 'immediately apparent' if the officers have 'probable cause' to believe that the item is either evidence of a crime or contraband."[16]   That standard was met because Detective King, the lead investigator who instructed an officer to seize the items, was aware of Conlan's harassing electronic communications.[17]

## B.

The gun was found under a hat on the floor of the passenger's side of Conlan's vehicle; the riot stick was found behind the driver's seat.  The court denied the suppression motion on the ground that the vehicle could properly have been impounded as an instrument of the crime and, "as a result of an inventory search, [officers] would have found the weapon and the nightstick regardless."[18]

"[T]he police may seize a car from a public place without a warrant when they have probable cause to believe that the car itself is an instrument or evidence of crime." *United States v. Cooper*, 949 F.2d 737, 747 (5th Cir. 1991). "[P]olice may make a warrantless inventory search of a legitimately seized car, as long as the inventory search is conducted according to established

---

[15] *See Horton v. California*, 496 U.S. 128, 136 (1990); *Waldrop*, 404 F.3d at 368–69.

[16] *Waldrop*, 404 F.3d at 369 (quoting *United States v. Buchanan*, 70 F.3d 818, 826 (5th Cir. 1995)) (internal quotation marks omitted).

[17] *See id.* at 369–70 (holding plain-view seizure appropriate when made in reliance on collective knowledge of officers who are in communication).

[18] The government claimed that the "community caretaker" exception applied because officers testified that a motel manager had told them that Conlan was no longer was allowed to stay at the motel and that his vehicle and belongings could not be left there, but the court did not completely credit that testimony. *See McKinnon*, 681 F.3d at 208 ("In considering whether this exception applies, our constitutional analysis hinges upon the reasonableness of the 'community caretaker' impound viewed in the context of the facts and circumstances encountered by the officer.").

procedures of the searching police department." *Id*. at 748.[19]  Conlan suggests that exigent circumstances, in addition to probable cause, are required to seize a vehicle from a motel parking lot.  But his cited case, *United States v. Sinisterra*, 77 F.3d 101 (5th Cir. 1996), undermines that argument.  In reversing an order suppressing evidence found during a warrantless vehicle search in a mall parking lot, *Sinisterra* reaffirmed precedent upholding "evidence seized in warrantless searches of vehicles which were legally parked in privately-owned motel parking lots where there was probable cause to search but no showing of exigent circumstances."[20]  Because a warrantless search of a car in a motel parking lot does not require exigent circumstances,[21] and there was probable cause that the vehicle was evidence and an instrumentality of a crime,[22] the court properly denied suppression.[23]

---

[19] Conlan has not challenged the inventory procedures used by the police.  *See Cooper*, 949 F.2d at 748.

[20] *Sinisterra*, 77 F.3d at 105 (citing *United States v. Buchner*, 7 F.3d 1149, 1150–51, 1154–55 (5th Cir. 1993); *United States v. Ervin*, 907 F.2d 1534, 1536–39 (5th Cir. 1990)); *see also Florida v. White*, 526 U.S. 559, 565–66 (1999) (rejecting Fourth Amendment challenge to warrantless seizure of car in employer's parking lot, which the Court characterized as a "public area").

[21] There is some confusion as to when exactly the police discovered the weapons.  Officer Magill testified that he found the weapons during an inventory search of the vehicle incident to impoundment, but the district court recalled that the officers made the discovery while placing Conlan's possessions in the car.  Regardless of the timing, the existence of probable cause to seize the vehicle as evidence and an instrumentality of the offense of interstate stalking and subject it to an inventory search made the lawful discovery of the weapons inevitable.

[22] Conlan did not merely drive across state lines in order to commit an offense; he used the vehicle to drive past the victims' house, an act that formed part of his course of criminal conduct.  In *Cooper*, 949 F.2d at 748, we cautioned that "absent probable cause to believe the car contains contraband or evidence of crime, a warrantless seizure must be based on probable cause to believe the car itself is an instrument or evidence of crime, not merely that the car's owner committed a crime."  Nevertheless, we found sufficient evidence that a vehicle used in a robbery qualified as "both evidence and an instrument of a crime," *id*.—a conclusion that applies here as well.

[23] Any error would have been harmless because the jury would have found Conlan guilty beyond a reasonable doubt even if the evidence had been suppressed.  *See United States*

No. 13-50842

## VII.

Conlan asserts that the district court abused its discretion by granting his attorney leave to withdraw ten days before trial. "The withdrawal of an attorney in a given case is a 'matter entrusted to the sound discretion of the court and will be overturned on appeal only for an abuse of that discretion.'"[24]

David Gonzalez was Conlan's second appointed attorney, replacing an Assistant Federal Public Defender who had moved to withdraw at Conlan's request. At the hearing on Gonzalez's motion to withdraw, a federal agent testified that Conlan had told a cooperating inmate that he was planning to kill Gonzalez and flee to Belize. Gonzalez stated that Conlan's threats could "jeopardize [his] effectiveness as an advocate," and, after consulting the State Bar of Texas Ethics Hotline, he thought there was "an irreconcilable conflict."

The court found that there was "a reasonable likelihood that Mr. Conlan has threatened bodily harm against . . . Mr. Gonzalez," which created "a personal conflict of interest" that "is incurable and may not be waived." The court granted the motion to withdraw ten days before trial and appointed Bradley Urrutia to represent Conlan. Five days before trial, the court offered Urrutia more time to prepare, but he declined, stating that he was "prepared to go forward to trial as scheduled."

Conlan concludes, without any analysis, that the court abused its discretion because "there was no conflict of interest or irreconcilable conflict,"

---

*v. Willingham*, 310 F.3d 367, 372–73 (5th Cir. 2002). His communications were proven through testimony and JMP's copious phone and email records; and his intent was proven from the content of those communications and his contacts with the victims, despite warnings to stop. Furthermore, the victims never saw the gun or riot stick, so the weapons had little bearing on the reasonableness of their fear.

[24] *In re Wynn*, 889 F.2d 644, 646 (5th Cir. 1989) (quoting *Streetman v. Lynaugh*, 674 F. Supp. 229, 234 (E.D. Tex. 1987)).

No. 13-50842

completely ignoring the court's finding to the contrary. He also suggests that the court did not consider whether withdrawal would delay the trial, yet the court offered to grant Urrutia an extension multiple times. Despite his conclusional statement that he was adversely affected by the withdrawal, Conlan does not explain how Urrutia's performance was deficient. It was not an abuse of discretion to grant Gonzalez's motion to withdraw.

## VIII.

Conlan avers that the district court erred by denying his requests for self-representation and to substitute appointed counsel. "We review *de novo* the constitutional permissibility of [a defendant's] attempt to represent himself . . . ." *United States v. Cano*, 519 F.3d 512, 515 (5th Cir. 2008). A "trial court's refusal to appoint substitute counsel is reviewed for an abuse of discretion." *United States v. Simpson*, 645 F.3d 300, 307 (5th Cir. 2011).

### A.

On the first day of trial, Conlan declared that he would like to represent himself on the ground that Urrutia was unprepared and that Conlan had sent the court a letter to that effect. On the second day of trial, the court received the letter, which stated that Conlan wanted new counsel, and "in the meantime," he would "like to assume self-representation." The court denied both motions after finding that the requests did not represent a "clear and unequivocal" desire to represent himself but instead were "an attempt to manipulate this Court and to delay this case at the last minute and to attempt to . . . file additional motions that . . . no attorney would file for [him]."

Although defendants have a constitutional right to self-representation, the invocation of that right must be "clear[] and unequivocal[]." *Faretta v. California*, 422 U.S. 806, 835 (1975). A general expression of dissatisfaction with an attorney should not be construed as "an invocation of the *Faretta* right to

No. 13-50842

represent oneself, especially when made on the morning of trial,"[25] and "a defendant's request to represent himself at trial may be rejected if it is intended to cause delay or some tactical advantage."[26]

Conlan contends that his numerous requests to replace various appointed counsel were "the functional equivalent" of a clear and unequivocal invocation of his right to self-representation. But those motions indicate that Conlan actually wanted counsel, just counsel that would follow his every order.[27] Furthermore, in his letter, Conlan requested only temporary self-representation until new counsel was appointed, suggesting that he did not clearly and unequivocally wish to represent himself.[28] The court also had reason to believe that Conlan was just trying to delay: (1) the request was made on the morning of trial, and (2) in a hearing five days earlier, Conlan said that he wanted to file more pretrial motions, notwithstanding that the deadline had passed, and the court had concluded that "every motion that legitimately could be filed in this case" had already been submitted. The court did not err by concluding that Conlan had not clearly and unequivocally invoked his right to self-representation.

B.

"The Sixth Amendment guarantees the right to counsel, but 'indigent

---

[25] *Moreno v. Estelle*, 717 F.2d 171, 176 (5th Cir. 1983).

[26] *United States v. Vernier*, 381 F. App'x 325, 328 (5th Cir. 2010) (per curiam) (citing *United States v. Chapman*, 553 F.2d 886, 895 (5th Cir. 1977) (stating that it was error to deny a motion for self-representation as untimely because the right was asserted "before the jury had been empaneled, and there [was] no suggestion that he sought to delay or disrupt the trial")).

[27] The district court found that Conlan wanted a lawyer who "works under [his] thumb" and files the motions he wants "regardless of how frivolous."

[28] *Cf. Cano*, 519 F.3d at 516 (finding *Faretta* satisfied by a motion in which the defendant asked to "relieve or dismiss his counsel" and "invoke[d] his Constitutional Right to Self-Representation as to the matters before the court").

14

No. 13-50842

defendants have no right to appointed counsel of their choice.'"[29] "The court is constitutionally required to provide substitute counsel only if there is a substantial conflict or problem affecting the ability to represent the defendant—'a conflict of interest, a complete breakdown in communication or an irreconcilable conflict which led to an apparently unjust verdict.'"[30]

At no point does Conlan argue that there was a conflict or breakdown in communication between himself and Urrutia. He states in conclusional fashion that Urrutia was not prepared for trial, yet he fails to identify any arguments that Urrutia could have made with additional time. Furthermore, the district court specifically found that Urrutia was "capable and ready to proceed," and Urrutia declined the court's offer to delay the trial. The court also found that Conlan's motion was an "attempt to manipulate" the court and delay the case. Conlan has not shown that the court abused its discretion in declining his last-minute request to appoint a fourth lawyer.

IX.

Conlan maintains that the district court abused its discretion by denying his request for a mistrial on the basis of jury deadlock or juror misconduct. The jury received the case and deliberated for two hours before returning the next morning. Shortly thereafter, the court received a note stating that one of the jurors was disregarding the court's instructions to base deliberations on the evidence. The court reminded the jurors of their oaths and the instructions, but approximately forty-five minutes later it received another note indicating that a juror wanted to speak with the judge. The juror stated that the jury had

---

[29] *United States v. Mitchell*, 709 F.3d 436, 441 (5th Cir. 2013) (quoting *United States v. Fields*, 483 F.3d 313, 350 (5th Cir. 2007)).

[30] *Id.* at 441–42 (quoting *United States v. Romero–Trejo*, 476 F. App'x 790, 791 (5th Cir. 2012) (per curiam)).

15

No. 13-50842

possibly "reached an impasse," explaining that, although she believed she was following the court's instructions and considering only the evidence presented at trial, other jurors thought she was "out of order." Conlan moved for a mistrial, but the court denied that motion as premature.

To determine whether the juror was disregarding the court's instructions, it interviewed the other jurors individually. Then the court again summoned the juror at issue; she professed to understand her duty to reach a verdict based on the evidence in accordance with the instructions and denied that she was trying to avoid jury service. The court permitted her to return to deliberations, and the jury returned a guilty verdict two hours later.

"The decision to declare a mistrial is left to the sound discretion of the judge, but the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes."[31] "[B]ased on its unique perspective at the scene," the district court "is in a far superior position than [we are] to appropriately consider allegations of juror misconduct, both during trial and during deliberations."[32] The court was well within its discretion to deny Conlan's motion; it was not compelled to find a jury deadlock when there had been less than four hours of deliberation over two days, and only one juror said that "[p]ossibly we've reached an impasse."[33] Likewise, it was appropriate to reinstruct the jury, interview the jurors, and upon learning that the juror believed she could follow the instructions, send her back to deliberate. *See*

---

[31] *Renico v. Lett*, 559 U.S. 766, 774 (2010) (quoting *United States v. Perez,* 22 U.S. (9 Wheat.) 579, 580 (1824)) (internal quotation marks omitted).

[32] *United States v. Ebron*, 683 F.3d 105, 126 (5th Cir. 2012) (second alteration in original) (quoting *United States v. Boone*, 458 F.3d 321, 329 (3d Cir. 2006)) (internal quotation marks omitted).

[33] *Cf. United States v. Medrano*, 836 F.2d 861, 865 (5th Cir. 1988) (reasoning that mistrial was not improper where the jury sent three notes in twelve hours over two days, with the final note stating that the deadlock could not be broken).

No. 13-50842

*Ebron*, 683 F.3d at 128–29.

### X.

Conlan asserts that the district court erred by denying his motion to dismiss the indictment on speedy-trial grounds. Although Conlan submitted a second opening brief, "[w]e look to an appellant's initial brief to determine the adequately asserted bases for relief."[34] Likewise, we do not consider the new arguments raised in the corrected brief.[35] The district court's legal conclusions are reviewed *de novo*, its factual findings for clear error. *United States v. Hale*, 685 F.3d 522, 534 (5th Cir. 2012) (per curiam).

The Speedy Trial Act ("STA") requires a trial within 70 days after the indictment, 18 U.S.C. §§ 3161(c)(1), 3162(a)(2), but it excludes various delays arising from pretrial proceedings.[36] Conlan was indicted on August 16, 2011, and the speedy-trial clock stopped 12 days later when the government moved for a competency determination.[37] The court ordered Conlan examined at a federal medical center on September 21, and he was transported there on November 1. Save for a 10-day grace period, Conlan assumes that the entire

---

[34] *United States v. Scroggins*, 599 F.3d 433, 447 (5th Cir. 2010) (quoting *Knatt v. Hosp. Serv. Dist. No. 1 of E. Baton Rouge Parish*, 327 F. App'x 472, 483 (5th Cir. 2009)).

[35] Although he was instructed "not [to] raise new issues or new arguments" in his second brief, Conlan's counsel claimed that almost nine months of additional time was relevant to the speedy trial issue.

[36] Of relevance here are exclusions for delays resulting from "any proceeding, including any examinations, to determine the [defendant's] mental competency," § 3161(h)(1)(A); "any interlocutory appeal," § 3161(h)(1)(C); "any pretrial motion," § 3161(h)(1)(D); "the fact that the defendant is mentally incompetent . . . to stand trial," § 3161(h)(4); and any continuances granted when the court "find[s] that the ends of justice served by [the continuance] outweigh the best interest of the public and the defendant in a speedy trial," § 3161(h)(7)(A). Although "delay resulting from transportation of any defendant . . . to and from places of examination or hospitalization" is excludable, "any time consumed in excess of ten days from the date an order . . . directing such transportation, and the defendant's arrival at the destination shall be presumed to be unreasonable." § 3161(h)(1)(F).

[37] *See* § 3161(h)(1)(A); *United States v. Stephens*, 489 F.3d 647, 653 (5th Cir. 2007).

time between those dates counts toward the speedy-trial clock, but any excess time is only "*presumed* to be unreasonable." § 3161(h)(1)(F) (emphasis added). Although the district court found the presumption rebutted,[38] we need not review that conclusion because there was no STA violation even if the entire 30-day period counts. Moreover, Conlan has failed to challenge the court's ends-of-justice findings, which cover this entire period, and therefore he cannot show that they are clearly erroneous.[39]

Conlan avers that there were 68 nonexcludable days between the June 25 incompetency finding and his August 1 return to the medical facility.[40] Even if the clock would have restarted at the end of the 10-day grace period,[41] it never did so, because Conlan filed an interlocutory appeal on July 6, triggering the § 3161(h)(1)(C) exclusion through this court's June 2013 decision.[42] Conlan claims 51 nonexcludable days between the June 28, 2013, competency determination and the August 19 trial date, but only nine of those are non-excludable. The rest are excluded under § 3161(h)(1)(D) because Conlan filed

[38] The court had ordered a psychiatric examination from a federal facility—not just an evaluation by a psychologist—and the delay was because of the unavailability of a psychiatric bed.

[39] The first ends-of-justice finding, entered in September 2011, excluded all time from the original October 3, 2011, trial date through the time that "Conlan's mental competency to stand trial is determined." The second, made in June 2012, excluded "the period between the time Conlan was taken into federal custody until the time that [his] mental condition is so improved that th[e] trial may proceed . . . ."

[40] There are fewer than 68 days between those dates.

[41] *Compare United States v. Hernandez-Amparan*, 600 F. Supp. 2d 839, 842–43 (W.D. Tex. 2009) (holding that the ten-day period applies to the separate incompetency exclusion under § 3161(h)(4)), *with United States v. Lewis*, 484 F. Supp. 2d 380, 390–91 (W.D. Pa. 2007) (concluding that the ten-day period does not apply).

[42] Moreover, Conlan filed two motions that triggered the pending-motions exclusion under § 3161(h)(1)(D): a December 7, 2012, motion to appoint new counsel, which the court did not resolve until June 2013; and a February 4, 2013, motion to be housed in Houston, which the court denied on March 18. Those exclusions also cover any days that Conlan claims are nonexcludable from January 5 through February 7, 2013.

No. 13-50842

a motion to dismiss on July 8 that required an evidentiary hearing on August 2 and oral argument on August 14,[43] and he filed a motion *in limine* on August 15 that the court did not resolve until the morning of trial.[44]  Conlan's STA argument fails because any nonexcludable days do not exceed the allowable number.[45]

## XI.

Conlan was sentenced to sixty months of imprisonment on Counts One and Two, to be served concurrently, and thirty-six months on Count Three, to be served consecutively.  He maintains that the district court misinterpreted U.S. Sentencing Guidelines ("U.S.S.G.") § 5G1.2(d) by imposing the consecutive sentence, but his premise is false; the court did not impose that sentence under § 5G1.2(d), but rather as an upward variance.  Because Conlan did not make this objection below, we review it for plain error.  *See United States v. Ronquillo*, 508 F.3d 744, 748 (5th Cir. 2007).

Consecutive sentences can be used to achieve an above-guidelines sentence, which is what occurred here.[46]  In its Statement of Reasons, the court

---

[43] The court ruled on the motion on August 14.  *See United States v. Johnson*, 29 F.3d 940, 942–43 (5th Cir. 1994) ("[I]f a motion requires a hearing, [the pretrial motion exclusion applies to] the time between the filing of the motion and the hearing on that motion, even if a delay between the motion and the hearing is unreasonable.").

[44] Assuming the court took that motion under advisement on August 15, its ruling was well within the 30-day window for a pretrial motion that does not require a hearing.  *See id.*

[45] Because of inadequate briefing, Conlan has waived any argument that his constitutional right to a speedy trial was violated.  Although he dedicates nine pages to the STA issue, he mentions his constitutional right only in a concluding paragraph, stating that his "speedy trial rights were violated both under the Sixth Amendment as well as the Speedy Trial Act." *See Scroggins*, 599 F.3d at 477; *Adams v. Unione Mediterranea di Sicurta*, 364 F.3d 646, 653 (5th Cir. 2004) ("Issues not raised or inadequately briefed on appeal are waived.").

[46] *See Ronquillo*, 508 F.3d at 749–52; *United States v. Saldana*, 427 F.3d 298, 309 n.41 (5th Cir. 2005) ("[A] district court has discretion under 18 U.S.C. § 3584 to depart upwardly by running sentences consecutively, even when U.S.S.G. § 5G1.2 would otherwise mandate that the sentences run concurrently."); *United States v. Candrick*, 435 F. App'x 404, 406 (5th

marked the box, "The court imposed a sentence outside the advisory sentencing guideline system."  Leaving the "Departures Authorized by the Advisory Sentencing Guidelines" section blank, the court marked the box for a sentence "above the advisory guideline range," under "Court Determination for Sentence Outside the Advisory Guideline System," and identified four supporting § 3553(a) factors.  And in explaining its sentence, the court was explicit that it had considered two guidelines ranges—the one in the Presentence Report and the range applicable if Conlan had received acceptance-of-responsibility credit—but opted instead for an above-guidelines sentence driven by the § 3553(a) factors.  Conlan interprets the denial of the government's motion for a twelve-to-fifteen year "variance/departure" to mean that the court categorically rejected any variance or departure and therefore could have entered consecutive sentences only under § 5G1.2(d).[47]  That position is untenable on plain-error review in light of the clear evidence that the court imposed an above-guidelines sentence after considering the § 3553(a) factors.[48]

The judgments of conviction and sentence are AFFIRMED.

---

Cir. 2011) (per curiam).

[47] Conlan concedes that the proper vehicle for imposing a higher sentence "was either a departure or variance."  Other than claiming that the court misinterpreted § 5G1.2(d), Conlan does not make any argument that the non-guidelines sentence was unreasonable.

[48] *See United States v. Jacobs*, 635 F.3d 778, 780 & n.1, 783 (5th Cir. 2011) (per curiam) (treating sentence as variance where court called it a departure at sentencing but "clarified in the Statement of Reasons that it was imposing a sentence outside" the guidelines range).