# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

December 4, 2023

Lyle W. Cayce
Clerk

No. 22-30442

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

STERLING ROBINSON,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:20-CR-120-1

Before SMITH, SOUTHWICK, and HIGGINSON, *Circuit Judges*.
STEPHEN A. HIGGINSON, *Circuit Judge*:

Defendant-Appellant Sterling Robinson was convicted by a jury of one count of possessing a firearm or ammunition as a convicted felon and one count of attempted obstruction of a federal proceeding. He appeals his convictions, raising sufficiency challenges to both convictions, as well as errors relating to the evidence admitted at trial, the trial court's jury instructions, and the prosecutor's remarks in opening and closing arguments. He also appeals his sentence on the basis that the district court misapprehended its authority to order that his sentence run concurrently with another federal

sentence. We AFFIRM Robinson's convictions but VACATE his term of imprisonment and REMAND for a narrow resentencing as set forth below.

## I.

## A.

On March 13, 2020, Candace Anderson arrived at her apartment in New Orleans, with her nine-year-old son in the car. When she pulled into her parking spot, someone emerged from behind a nearby gate and began shooting at her car. Anderson drove to a nearby gas station, where she called 911.

She told the 911 operator that her ex-boyfriend Sterling Robinson had just shot at her car. Anderson told the operator that she had locked herself and her son in a gas-station bathroom and that she believed Robinson had followed them to the gas station. She described Robinson as "black, . . . brown[]-skinned," and about 5'2" in height. She said he was last wearing a red and white shirt with black jeans. She guessed that the weapon he fired was a "forty caliber."

About ten to fifteen minutes later, New Orleans Police Department ("NOPD") Officer Kevin Penn arrived on the scene, where his body camera captured his conversation with Anderson. Anderson told Officer Penn that when she arrived home, her ex-boyfriend was standing on the other side of a wooden gate, and when she parked her car, he came from behind the gate and began shooting at her car. She reiterated that she fled to the gas station and said that, when she exited her car, Robinson was there. Anderson explained that they lived together, but that she had broken up with him and "put him out" about three days earlier.

Continuing the interview in the parking lot, Anderson gave more details about the shooting, explaining that Robinson shot first at her tires and

then, when she backed up to leave and drive off, he continued shooting at the car. Anderson also asked Officer Penn if "the place that [she] need[s] to get a restraining order from" would be open tomorrow and if he could give her the address. While they were talking, Anderson received a call on her cell phone from Robinson. Officer Penn told her not to answer it, and she declined the call.

When Anderson saw the bullet holes in the back of her car, Anderson said, "Dang, that could've went straight through," and "I can't believe that." She explained that she had a big speaker in the trunk of the car and speculated that it may have stopped the bullets. Anderson took pictures of the holes in the back of the car and sent them to Robinson with the message, "U trying to kill me." Robinson responded: "Man I'm crying my heart out it to[o] much im about to just kill myself f[or ]r[eal]."

In another segment of body-camera footage from the gas station, Anderson can be heard (but not seen) talking on the phone. She says, "[Y]ou could've killed me, son. If that speaker wasn't back there, . . . I'd be dead, son, and that's what you want." She then raises her voice and says, "You trying to kill me!" In response to something Robinson said, Anderson threatened to kill Robinson and his children and stated that if Robinson killed her parents, she would receive money.

Officer Penn then drove to Anderson's apartment where she reenacted the shooting, demonstrating how Robinson emerged and shot at her car. A crime-scene investigation ultimately documented five nine-millimeter caliber casings on the ground, deemed to have been fired from the same weapon. Robinson was subsequently arrested.

On March 17, 2020, four days after the shooting, Robinson called Anderson from the Orleans Parish Prison. He told Anderson she needed to come to the prison early the next morning, stating, "It ain't nothing but

domestic violence and . . . domestic violence aggravated assault with a firearm." Robinson told Anderson that she needed to visit the DA's Office, so that he can get a "cheap" bond and so that the other charges would be "throw[n] . . . out."

In a phone call later that day, Robinson again pressed Anderson to visit the DA's Office and sign an affidavit, which would ensure he was "straight." Within the hour, Robinson called Anderson a third time, insisting she arrive early, so that "[t]hey can hurry up and throw that sh*t out." He added that he needed to get out of prison before the "feds try to . . . pick [it] up too." On a fourth phone call that same night, Robinson said he missed Anderson. When Anderson asked why he did something "like that to jeopardize" it, Robinson responded, "I don't know, son.  I f**ked up." Later in the call, Robinson once again referenced an affidavit, stating, "Once you fill that affidavit out, they gone throw that sh*t out right then and there."  Anderson never went to the DA's office to sign any affidavit.

While in custody, Robinson was arrested by Jefferson Parish in April 2020 booked for a murder that occurred in neighboring Jefferson Parish on the same night as the shooting of Anderson's car. Robinson remained in continuous physical custody. No evidence of this murder was admitted at Robinson's trial in this case.

Robinson and Anderson continued to speak on the phone over the next several months. On September 22, 2020, Robinson called Anderson not from his own jail account but from the account of another incarcerated person after Anderson told Robinson that their calls were being recorded. The two discussed a meeting Anderson had with the Jefferson Parish District Attorney's Office earlier that day. Anderson relayed that the Jefferson Parish DA's Office knew all about the Orleans Parish shooting and had the 911 call, the police report, their text messages, and recordings of their phone calls.

Robinson responded that Anderson needed to tell the DA that "what happened in Orleans, that wasn't him, so . . . That's all you have to tell the people." He continued, "Man, you ain't telling people I had nothing to do with it." Anderson responded: "I can't lie and can't tell the people, them people know everything, I'm telling you they know everything." Later in the call, Robinson asked Anderson again about Orleans Parish. Robinson prompted, "You told them it was me," to which Anderson responded, "Man, them people not stupid."

In another phone call that same evening, Anderson confirmed she told the Jefferson Parish DA's Office that she identified Robinson as the one involved in "what happened in Orleans Parish." When Robinson asked why, she responded, "They already know everything." Later in the conversation, after Anderson told Robinson that "they" have the bullets that were removed from her car, Robinson again said, "all you had to tell the people was, none of that, none of that wasn't him." When Anderson stated that she had already given three statements and cannot change her story now, Robinson disagreed, stating that people take their statements back. In that same call, Robinson criticized Anderson for not picking up when he called her that morning prior to her meeting with the Jefferson Parish DA's Office. Robinson repeatedly told Anderson that she should have told the DA's Office that she had assumed it was Robinson who shot at her because they got into fight earlier, but that she now realized it was not him.

He continued: "It wasn't my old man that did this. Come on man, that's all you have to tell the people son . . . [T]hat's what I was calling this morning to let you know, . . . to school you on, son, to let you know who . . . You see what I'm saying, huh, hello, Candace?" Anderson told Robinson that she did not intend to testify to the grand jury and that she would not turn on him. As the call neared its close, Robinson reiterated what he wanted Anderson to do: "[I]f they was to bring Orleans Parish up in anything, . . . all

you have to do, I'm not talking about what's going on out there. I don't know what happened out there."

On November 5, 2020, a grand jury indicted Robinson on one count of possessing a firearm as a convicted felon, in violation of 18 U.S.C. § 922(g)(1), and one count of attempting to obstruct justice by getting "C.A." to provide false information about his criminal conduct, in violation of 18 U.S.C. § 1512(c)(2).

## B.

At trial, the parties stipulated that Robinson had a prior felony conviction. The Government presented—over various objections raised by the defense and overruled by the judge—the evidence summarized above, including the 911 call, the body-camera footage, and the phone calls from prison. The Government also presented testimony from, among others, the NOPD officer who responded to Anderson's 911 call; the NOPD crime lab technician who collected the shell casings at the scene; an expert who confirmed that the casings came from the same firearm; and an ATF agent who gave expert testimony that four of the shell casings were manufactured in Arkansas and that one was manufactured in Mexico.

The Government also called Anderson, who did not want to testify, and who appeared only because she was under subpoena. Once on the stand, Anderson recanted her entire story involving Robinson shooting at her car. She acknowledged that she had told the 911 operator and multiple authorities that it was Robinson who shot at her, and that she texted Robinson the photo of the bullet holes in her car, with the message, "You're trying to kill me," But she testified that, although someone shot at her car, it was not Robinson.

Anderson attributed her claimed mistaken identification in part to the migraine she was suffering from at the time of the shooting as well as the fact that her car windows were tinted and it was dark outside. At the same time,

however, she testified that the shooter was too tall to have been Robinson. When asked by the Government about the jail call when she told Robinson "You should'nt [have] did that," she denied that she was referring to the shooting and said it was instead a reference to an "argument that [they] had had a couple days before that."

The Government also asked Anderson why she identified Robinson as the shooter on the 911 call. Anderson said she was "kind of shaken up" because she had just been shot at with her child in the car and had assumed that the shooter was Robinson because of their recent argument. On cross-examination, Anderson agreed with defense counsel's assessment that she had been "mad and mistaken" when she previously accused Robinson.

At the close of the Government's case, Robinson moved for a judgment of acquittal on both counts, which the court denied. Robinson did not present any evidence. After deliberations, the jury rendered a verdict finding Robinson guilty on both counts.

## C.

Robinson was sentenced on July 21, 2022. Judge Fallon imposed a sentence of 120 months on count one and 120 months on count two, to run consecutively, for a total of 240 months. The court then stated that the sentence is to run concurrently with the sentences Robinson will serve in case numbers 15-cr-72, Robinson's previous federal drug-trafficking conviction before Judge Jane Milazzo, and S139-2039, a state case. In the other federal case, during the time between Robinson's jury trial and sentencing in *this* case, Judge Milazzo had revoked Robinson's term of supervised release and imposed a prison sentence of twenty-seven months, which she ordered to "run consecutively with any sentence imposed under criminal docket 20-120," which is the case before us.

During Robinson's sentencing hearing before Judge Fallon, the Government raised the discrepancy between Judge Milazzo's order that the two federal sentences run consecutively with Judge Fallon's oral order that the two run concurrently. In response, Judge Fallon said that "if [Judge Milazzo] made it consecutive to mine, I won't deal with that one" and only addressed the state-court sentence, which he ordered to run concurrently with the sentence he was imposing. In Robinson's written judgment, the term of imprisonment specifies that it is to run concurrently with the sentence imposed in the state case but does not mention the other federal case.

## D.

Robinson timely appealed. First, he challenges the sufficiency of the evidence to support his two convictions. Second, he contends that the district court reversibly erred by admitting hearsay in the form of the body-camera video and jail-call recordings and by failing to instruct the jury on the limited use of impeachment evidence. Third, Robinson argues that improper remarks by the prosecution warrant a new trial. And finally, he contends that his sentence should be vacated and remanded for resentencing because the district court erroneously perceived that it was bound by Judge Milazzo's order that the sentences in the two federal cases run consecutively. We address each in turn.

## II.

Robinson challenges the sufficiency of the evidence to support his two convictions. Robinson preserved his sufficiency challenges by moving for a judgment of acquittal under Rule 29(a) of the Federal Rules of Criminal Procedure, so this court's review is *de novo*. *United States v. Johnson*, 990 F.3d 392, 398 (5th Cir. 2021). We must affirm each jury verdict if, "viewing the evidence in the light most favorable to the verdict and drawing all reasonable inferences from the evidence to support the verdict," a "reasonable trier of

fact could conclude from the evidence that the elements of the offense were established beyond a reasonable doubt." *United States v. Valencia*, 600 F.3d 389, 430-31 (5th Cir. 2010) (citation omitted).[1]

### A.

Robinson first challenges the sufficiency of the Government's evidence to convict him under 18 U.S.C. § 922(g)(1) for being a felon in possession of a firearm or ammunition. To convict Robinson under § 922(g)(1), the Government needed to prove that (1) Robinson was a felon, (2) he knew he was a felon, (3) he knowingly possessed a firearm or ammunition, and (4) the firearm or ammunition traveled in interstate commerce. *Johnson*, 990 F.3d at 400 (citing *Rehaif v. United States*, 139 S. Ct. 2191, 2200 (2019)).

Three of the four elements are easily satisfied. Robinson stipulated at trial that he had a prior felony. This satisfies the first element—that he was a felon—as well as the second—that he knew his status. *See United States v. Kieffer*, 991 F.3d 630, 635 (5th Cir. 2021) ("Because [the defendant] stipulated to being a felon at trial, there was sufficient evidence to establish

---

[1] Although Robinson separately challenges the admissibility of some of the evidence the Government presented to support the convictions, the sufficiency challenges should be disposed of first, without reference to the evidentiary issues, for double-jeopardy purposes. If "the record evidence, including the inadmissible evidence, discloses insufficient evidence of guilt," so as to "entitle the defendant . . . to a judgment of acquittal," *United States v. Marshall*, 762 F.2d 419, 423 (5th Cir. 1985), then a second trial of the defendant is barred by the Double Jeopardy Clause, *see Burks v. United States*, 437 U.S. 1, 11 (1978). Accordingly, "[i]n conducting a sufficiency review under such circumstances, we consider *all* of the evidence that was before the jury—including [any] evidence that was erroneously admitted." *United States v. Miller*, 146 F.3d 274, 280 (5th Cir. 1998) (emphasis added) (citing *Lockhart v. Nelson*, 488 U.S. 33 (1988), and *Marshall*, 762 F.2d at 419).

that he knew he was a felon[.]").  As to the fourth element, the Government presented testimony from an ATF agent that the casings found at the scene of the shooting were manufactured in Arkansas and Mexico and submitted an interstate-nexus report to the same effect. Robinson does not dispute the sufficiency of the evidence as to any of these three elements.

Robinson challenges only the third element—his possession of the firearm or ammunition—on the basis that the jury could not reasonably find that Robinson committed the shooting. Robinson argues that the Government's only evidence pointing to him as the shooter was Anderson's initial identification of Robinson. Because Anderson testified under oath that she was mistaken and that Robinson was not the shooter, Robinson argues that the jury was precluded from finding him guilty beyond a reasonable doubt.

On close record analysis, we do not disturb the jury's verdict. The Government played for the jury the audio of the 911 call in which Anderson unequivocally said that her "boyfriend was just shooting at [her] car," and that he is "armed and dangerous." Anderson described him as 5'2" and wearing a red and white shirt with black jeans. She said his name is Sterling Robinson. The Government also played body-camera footage of Anderson's conversation with the responding officer. In the video, she tells the officer that her ex-boyfriend shot at her and explains that they had recently broken up. The Government published to the jury text messages that Anderson sent Robinson shortly after the shooting, containing a picture of the bullet holes in her car, with the text, "U trying to kill me." Robinson's response was not a denial or expression of confusion but instead, "Man I'm crying my heart out it['s] to[o] much im about to just kill myself." The jury also heard jail-call audio from days after the shooting, in which Anderson told Robinson, "You shouldn't [have done] that!" Robinson again did not deny any wrongdoing and instead responded, "Man, you know I didn't mean it though

man, come on, you know I didn't mean that." In other calls, months after the shooting, Robinson told Anderson "I know you ain't tell them people nothing about Orleans Parish," which is where the shooting happened, and lamented that Anderson was not "telling people [he] had nothing to do with it." To this, Anderson responded, "I can't lie."

This evidence is enough for a reasonable jury to conclude that Robinson shot at Anderson's car. While Anderson recanted her accusations on the stand, the jury was not required to believe her trial testimony over her earlier unequivocal identifications of Robinson. *United States v. Huntsberry*, 956 F.3d 270, 279 (5th Cir. 2020) ("We accept 'all credibility choices and reasonable inferences made by the trier of fact which tend to support the verdict' and resolve conflicts in the evidence in favor of the verdict." (citation omitted)).

Even beyond the jury's ability to assess Anderson's demeanor and body language, the jury's decision to disbelieve Anderson's trial testimony finds support in the written record. Even if the jury believed that Anderson's perception of the shooter was compromised because of her migraine and tinted windows, she failed to offer a consistent explanation for why she named Robinson specifically. She instead equivocated between an anger-fueled accusation, and an honest assumption. Most critically, though, Anderson had an obvious reason to lie on the stand. Not only did she agree on the record that she did not want to testify against someone she has feelings for, but indeed the jail calls revealed that Robinson encouraged Anderson at length to change her story. The jury was entitled to conclude that Anderson's

No. 22-30442

trial testimony was not a belatedly discovered truth but instead a response to Robinson's influence.[2]

Viewing the evidence in the light most favorable to the verdict, there was sufficient evidence that Robinson was the shooter, permitting the jury to conclude beyond a reasonable doubt that Robinson knowingly possessed the firearm and ammunition. His § 922(g)(1) sufficiency challenge fails.

B.

Robinson also challenges the sufficiency of the Government's evidence to convict him of attempting to obstruct justice under 18 U.S.C. § 1512(c)(2). The statute penalizes anyone who "corruptly . . . obstructs, influences, or impedes any official proceeding, or attempts to do so." *Id.* Under the statute, an "official proceeding" must be federal in nature but is otherwise broadly defined, including any proceeding "before a judge or court of the United States" as well as a federal grand jury. 18 U.S.C. § 1515(a)(1)(A), (g)(1). Although a proceeding "need not be pending or about to be instituted at the time of the offense," 18 U.S.C. § 1512(f)(1), the proceeding "must at least be foreseen, such that the defendant has in contemplation some particular official proceeding that he intends his conduct would impede or obstruct." *United States v. Delgado*, 984 F.3d 435, 452 (5th Cir. 2021) (internal quotations and citation omitted). Similarly, there must be "some 'nexus' between the obstructive act and some official government

---

[2] Robinson cites a Sixth Circuit case from 1979, *United States v. Orrico*, 599 F.2d 113, 118 (6th Cir. 1979), and a Utah Supreme Court case from 1989, *State v. Ramsey*, 782 P.2d 480, 484 (Utah 1989), for the proposition that "courts have held that an uncorroborated, out-of-court allegation that is recanted by the declarant at trial is legally insufficient to sustain a guilty verdict." Setting aside that those cases are many decades old and from out-of-circuit jurisdictions, they do not resemble Robinson's case. Here, Anderson's "out-of-court allegation" that Robinson shot at her car is not "uncorroborated" for the reasons just described.

proceeding." *Id.* (citation omitted). Finally, "a person acts 'corruptly' under the statute when they act 'knowingly and dishonestly, with specific intent to subvert or undermine the due administration of justice.'" *Id.* (citation omitted). This intent can be proven with "circumstantial evidence alone." *United States v. Bedoy*, 827 F.3d 495, 509 (5th Cir. 2016) (citation omitted).

To demonstrate "attempt," the Government must show that the defendant specifically intended to commit the underlying crime and took a "substantial step" toward committing it. *United States v. Howard*, 766 F.3d 414, 419 (5th Cir. 2014) (citation omitted). A "substantial step" is one that "strongly corroborates the firmness of the defendant's criminal intent." *Id.* It must be "'more than mere preparation,' but is 'less than the last act necessary before' the crime is in fact committed." *Id.* (citation omitted).

The Government's evidence of Robinson's attempted obstruction of justice consisted of two sets of phone calls from prison: the March 2020 calls and the September 2020 calls. In the March calls, Robinson encouraged Anderson to go to the D.A.'s office to sign what appears to be a drop-charges affidavit, and in the September calls, Robinson explained to Anderson how she might change her story. Because we conclude that the September calls independently constitute attempted obstruction and support Robinson's § 1512(c) conviction, we do not address the March calls.

Robinson's challenges to the sufficiency of the September phone-call evidence to support his conviction for attempted obstruction are twofold. First, he contends that the September conversations pertained to Anderson's meeting at the Jefferson Parish D.A.'s office, but that no "official proceeding," *i.e.*, federal proceeding, arose from the Jefferson Parish investigation. Second, he argues that Robinson's comments were wholly retrospective, as he explained to Anderson what she "should have and could have said" in her meeting with Jefferson Parish.

Both arguments, however, cannot be reconciled with the record. First, while Robinson is correct that the September calls focused on Anderson's meeting earlier that day with the Jefferson Parish D.A.'s office—and that the Jefferson charge (a murder) did not itself become federal—Robinson's obstructive comments on the September calls did not involve the Jefferson Parish charges. Instead, Robinson repeatedly asked about, and gave Anderson instructions on, the Orleans Parish charges. Importantly, there has been no suggestion, at trial or in briefing now, that there was any other conduct in Orleans that Robinson might have been addressing. And even if there were, the jury could reasonably infer that his obstructive comments were about the shooting.

Accepting the conclusion that Robinson's comments pertained to Orleans, his argument that the *Jefferson* investigation did not become federal falls by the wayside. Obstruction as to Orleans is obstruction as to the shooting, which went federal. *See Delgado*, 984 F.3d at 452 (explaining that the defendant need only "'ha[ve] in contemplation some particular official proceeding' that he intends his conduct would impede or obstruct" (citation omitted)). The statute does not require that Robinson specifically apprehend or anticipate the federal nature of the proceedings.[3] "'[N]o state of mind need be proved with respect to' whether the proceeding is federal to prove § 1512(c) was violated." *Bedoy*, 827 F.3d at 508 (quoting 18 U.S.C. § 1512(g)(1)).

Second, Robinson is mistaken when he argues his comments were only retrospective. While Robinson emphasizes that the phone calls happened *after* Anderson's meeting with the Jefferson Parish D.A., the

---

[3] In any case, the jury could have reasonably concluded that Robinson anticipated that the shooting would go federal as he made a specific reference to "the feds" picking up the charges in the March phone calls.

comments were not mere lamentations of what could have been. Instead, Robinson repeatedly urged Anderson to change her story. As one example, Robinson told Anderson: "all you have to tell them people is, I understand everything y'all saying but . . . that wasn't him, . . . what happened in Orleans, that wasn't him, so . . . what are y'all talking about. That's all you have to tell the people." A rational factfinder could easily conclude that this was forward-looking advice—that is, a substantial step toward corruptly influencing proceedings by encouraging Anderson to lie. The same is true for another portion of the calls. Robinson told Anderson: "if they was to bring Orleans Parish up in anything, . . . all you have to do" is say "I'm not talking about what's going on out there. I don't know what happened out there." Robinson's comments are trained on a future plan, telling Anderson that if authorities "*w*[*ere*] *to bring Orleans Parish up*," she should decline to talk about it and say she did not know what happened. Beyond the calls themselves, Anderson's trial testimony itself reinforces the conclusion that Robinson was encouraging her to lie for him moving forward. After all, once on the stand, she did what Robinson asked: recant her prior statements.

The September phone calls were sufficient evidence upon which the jury could conclude that Robinson attempted to "corruptly . . . obstruct[], influence[], or impede[] an[] official proceeding," 18 U.S.C. § 1512(c)(2), namely by encouraging Anderson to lie for him with regard to the shooting in Orleans Parish. Robinson's sufficiency challenge to his conviction on count two therefore fails.

## III.

Robinson also argues that the district court erred in admitting (i) the body-camera footage and (ii) the audio from the jail calls. He further contends (iii) that the district court erred in not giving the jury an instruction on the limited use of evidence of prior inconsistent statements.

No. 22-30442

The government agrees that Robinson preserved his evidentiary objections to the body-camera footage, hence this court will review for abuse of discretion, subject to a harmless-error analysis. *United States v. Noria*, 945 F.3d 847, 853 (5th Cir. 2019) (citation omitted). Similarly, a failure to provide a requested jury instruction is reviewed for abuse of discretion, *United States v. Grant*, 683 F.3d 639, 650 (5th Cir. 2012), subject to harmless-error review, *United States v. Aldawsari*, 740 F.3d 1015, 1019 (5th Cir. 2014). On the other hand, Robinson has not identified specific preservation of evidentiary objection to recorded jail call statements, as we discuss below.[4]

A.

The parties agree that some portion of the body-camera footage is admissible for its truth. Specifically, the Government argues, and Robinson concedes, that Anderson's statements identifying Robinson constitute prior identifications of someone the declarant perceived earlier, and are therefore admissible as non-hearsay under Federal Rule of Evidence 801(d)(1)(C). Rule 801(d) provides that a statement is not hearsay if "[t]he declarant testifies and is subject to cross-examination about a prior statement, and the statement . . . identifies a person as someone the declarant perceived earlier." Fed. R. Evid. 801(d)(1)(C). Anderson testified and was subject to cross-examination, so each of her prior statements that Robinson shot at her is admissible non-hearsay under this rule. This accounts for the considerable material in the body-camera footage.

---

[4] In briefing as to standard of review, Robinson directs us to his written objection to the body-camera footage, as well as a pre-trial discussion before the district court regarding hearsay issues that may exist in *both* the body camera video and also the audio calls. Ultimately, because we conclude that any error in the unrestricted admission of specific statements in the audio calls would be harmless, Robinson's appellate argument as to audio statements heard by the jury necessarily would also fail applying procedural default and a plain-error standard of review.

As to the remainder of the footage,[5] Robinson's substantive evidentiary arguments on appeal are briefed too imprecisely to permit meaningful assessment by this court. Robinson does not proceed through the body-camera footage on a statement-specific basis and instead objects to the footage wholesale. But the footage collectively lasts for over twenty minutes and contains many statements, by different speakers, made under many different circumstances. The hearsay character of a statement and/or the applicability of a given hearsay exception is necessarily tethered to individual statements or categories of statements.

For instance, when Anderson's phone lights up because she's receiving a call, she immediately says, "That's him calling me now." This statement is an admissible present-sense impression because it is a description of an event made "made while or immediately after the declarant perceived it." Fed. R. Evid. 803(1). As another example, Anderson's statements made during the fight on the phone (presumably with Robinson) qualify as "excited utterance[s]," because they are "statement[s] relating to a startling event or condition"—here, the shooting itself and the discovery of the bullet holes in her car—"made while [she] was under the stress of excitement that it caused." Fed. R. Evid. 803(2).

The body-camera footage as a whole, therefore, is not a workable unit for appellate argument and analysis. To decide whether the district court abused its discretion in admitting the evidence, we would need to proceed through the various statements made over the course of twenty minutes of video footage and assess whether Robinson has shown an error in each

_____

[5] Although the district court initially admitted the body-camera footage to refresh Anderson's recollection and for impeachment at the end of trial, the court concluded that the footage was admissible for its truth as present-sense impressions and excited utterances.

statement's admission at trial.  Without party briefing as to the admissibility of individual statements, we are unable to find reversible evidentiary error.

Even if we assume some portion of the body-camera footage were inadmissible, it did not have a "substantial and injurious" influence, *see United States v. Lowery*, 135 F.3d 957, 959 (5th Cir. 1998) (citation omitted) on the jury's verdict.  The other admissible evidence included the 911 call on which Anderson said that Robinson was shooting at her car, Anderson's text messages to Robinson containing a photo of the bullet holes with the caption "U trying to kill me," as well as Anderson's repeated identifications of Robinson as the shooter on the body-camera footage.

Furthermore, the body-camera footage was cumulative with admissible evidence. *See El-Mezain*, 664 F.3d at 526 ("It is well established that error in admitting evidence will be found harmless when the evidence is cumulative, meaning that substantial evidence supports the same facts and inferences as those in the erroneously admitted evidence."). For example, Robinson objects to Anderson's statements that her son was in the car, but that evidence was cumulative with the 911 call where she said her boyfriend was shooting at her car and her nine-year-old son was with her. Robinson also objects to Anderson's statements involving the location of the bullets in the car and the notion that Robinson was "trying to harm" her or "trying to kill" her, but that evidence was cumulative of Anderson's text message to Robinson containing a photo of the bullets, with the accusation, "U trying to kill me."

The other material—relating generally to Anderson's breakup with Mr. Robinson, her "feelings" about him, and the "details of their relationship"—may have been, as Robinson argues, "irrelevant" and "inflammatory," but that objection sounds in Rule 403, not substantially prejudicial hearsay. *See El-Mezain*, 664 F.3d at 494. Considering the other

substantial evidence that Robinson shot at Anderson's car, it cannot be reasonably said that those statements "had a substantial . . . effect" on the jury's view of Robinson's guilt of the crime charged, *i.e.*, possession of the gun. *See Lowery*, 135 F.3d at 959 (citation omitted). There is no "reasonable possibility that [any] improperly admitted evidence" in the body-camera footage "contributed to the conviction." *See El-Mezain*, 664 F.3d at 526 (citation omitted).

Therefore, if there was any error in the admission of the footage, it was harmless.

## B.

Robinson also argues that the district court erred in admitting audio of Robinson's and Anderson's phone calls from jail. Robinson first objects to the admission of Anderson's statements to Robinson on the March calls that he "shouldn't [have done] that," and that he "f**ked everybody up." He adds in a parenthetical, but says nothing further about, Anderson's statement to Robinson that she "hopes [he] learns [his] f**king lesson for real." This argument fails because, even if the statements were for some reason inadmissible,[6] they are cumulative with Anderson's other, repeated accusations of Robinson, evidence of which was properly admitted via the 911 call, the text messages, and the body-cam footage of her 801(d)(1)(C) prior identifications. *See El-Mezain*, 664 F.3d at 526; *United States v. Hall*, 500 F.3d 439, 444 (5th Cir. 2007).

---

[6] Only one of these statements appears to qualify as hearsay: Anderson's statement that Robinson shouldn't have "[done] that" seems to have been offered for the truth of the fact that Robinson *did* "that," *i.e.*, the shooting. The other statements do not appear to have been offered for their truth.

No. 22-30442

Robinson also objects to certain statements made on the September phone calls. Robinson argues that the district court erred in admitting Anderson's statements about what the Jefferson Parish District Attorney's Office told her. He contends that Anderson's statements that the authorities "already know everything," "already know what happened in Orleans Parish," and the like, were inadmissible hearsayHe further contends that the statements were prejudicial because they implied that the case was "open-and-shut."

The Government argues, and Robinson does not dispute, that *Robinson's* statements on the phone calls are admissible non-hearsay as statements of a party-opponent. This is correct. *See* Fed. R. Evid. 801(d)(2)(A) (providing that a statement is not hearsay if it is "offered against an opposing party and . . . was made by the party in an individual . . . capacity").

The Government further argues that *Anderson's* statements on the calls are admissible to provide context for what Robinson was saying. We agree that when a defendant's recorded statements are admissible as a party-opponent admission under Rule 801(d)(2)(A), an interlocutor's statements, "even if considered hearsay," are "admissible to put [the defendant's] statements into context." *United States v. Dixon*, 132 F.3d 192, 199 (5th Cir. 1997); *see also United States v. Jones*, 873 F.3d 482, 496 (5th Cir. 2017) ("[The defendant's] statements during these calls were admissions of a party opponent under Federal Rule of Evidence 801(d)(2)(A), and the other call participants' statements were admissible to provide context.").

The phone-call transcripts reveal that all of Anderson's comments about Jefferson Parish gave context to Robinson's questioning and fixation on what Anderson told authorities about Orleans Parish, as well as his repeated urgings that she should not have told them that he was the culprit.

However, the case law that sanctions this practice does not permit the interlocutor's statements to be admitted for their truth. *See United States v. Gutierrez-Chavez*, 842 F.2d 77, 81 (5th Cir. 1988).

Neither Robinson nor the Government points to a limiting instruction, requested or given, restricting use by the jury of Anderson's comments during the jail calls. And, on appeal, Robinson does not argue the district court committed reversible error by failing to provide a limiting instruction that her audio call statements could only be relied upon for context, but instead that Anderson's comments are inadmissible hearsay. In that posture, we assume that the jury improperly may have used Anderson's side of the conversation for the truth of what Jefferson Parish "knew" and what evidence they had of Robinson's guilt, but we hold that any such error is harmless. Anderson specifically said that authorities had her text messages to Robinson and her prior accusations of Robinson, including on the 911 call. The 911 call, the text messages, and Anderson's other prior accusations of Robinson were all properly admitted at trial, meaning that Anderson's statements on the call with Robinson did not "bolster" the Government's case against Robinson to any perceptible degree. Anderson's statements, even if admitted for their truth, are therefore cumulative with the admissible evidence, rendering any error harmless. *See El-Mezain*, 664 F.3d at 526; *Hall*, 500 F.3d at 444.

For these reasons, we find no error in the district court's admission of the jail-call audio and transcripts.

## C.

Robinson also argues that the district court reversibly erred in failing to give the jury instruction he requested on the limited use of prior inconsistent statements. "A refusal to give a requested instruction is reversible error only if the proposed instruction was (1) substantively correct,

(2) not substantively covered in the jury charge, and (3) concerned an important issue in the trial, such that failure to give the requested instruction seriously impaired the presentation of a defense." *United States v. Jones*, 132 F.3d 232, 242 (5th Cir. 1998).

Robinson's argument fails on the third prong. Robinson does not specify the trial statements he contends should have been subject to the requested instruction—that is, evidence that was admitted only for impeachment by prior inconsistency. As Robinson elsewhere acknowledges, Anderson's initial statements identifying Robinson were properly admitted as substantive evidence under Rule 801(d)(1)(C), which classifies prior identifications by the declarant as non-hearsay. In addition, the 911 call was fully admissible for its truth as a present-sense impression. Because none of Anderson's prior statements identified for us was admitted as a prior inconsistent statement for impeachment only, the requested instruction was not only unnecessary, but indeed would have been—as the district court observed—"misleading."

Accordingly, the district court did not abuse its discretion in declining Robinson's request to give a jury instruction on the limited use of prior inconsistent statements.

\* \* \*

For these reasons, Robinson has not shown that the district court abused its discretion as to its admission of evidence or its jury instructions.

## IV.

Robinson also argues that the prosecution made improper remarks in its opening and closing arguments, warranting a new trial. To prevail on this claim, he must make two showings: (1) that the prosecutor made an improper remark and (2) prejudice from the remark. *United States v. Beaulieu*, 973 F.3d

354, 360 (5th Cir. 2020). Robinson concedes that he did not object to these remarks in the trial court, meaning that this court reviews only for plain error. To establish plain error, Robinson must show an error that was clear and obvious and that the error affected his substantial rights. *Puckett v. United States*, 556 U.S. 129, 135 (2009). If he makes such a showing, this court has the discretion to correct the error if it seriously affects the "fairness, integrity or public reputation of judicial proceedings." *Id.* (citations omitted).

Robinson's objections to the arguments fall into two general categories. First, he argues that the Government appealed to juror passions and the need to protect the community from future harm. Robinson specifically argues that the Government should not have tasked the jury with protecting "the most vulnerable people in our society" from "the most dangerous." He further takes issue with the Government's statement that dropping charges—as Robinson urged Anderson to request—"would allow a lie to stand, and you're not allowed to let a lie stand, not when her little boy's life is in jeopardy." He contends that the Government improperly told the jury that "truth" and "justice" required pursuing the charges.

The Government did not act improperly in this regard. As to Robinson's dangerousness and the victims' vulnerability, these were permissible characterizations of the trial evidence, which showed that Robinson shot at Anderson's car while her nine-year-old son was inside, and then encouraged her to recant her statement to authorities. That Robinson "disliked . . . the inferential gloss that the Government chose to put on th[e] facts[] cannot be a ground for reversal, in light of attorneys' 'wide latitude' in crafting their closing arguments." *United States v. Valas*, 822 F.3d 228, 244-45 (5th Cir. 2016) (citation omitted).

As to "truth," "justice," and the juror's role on behalf of the community, this court has explained that "unless calculated to inflame, an

appeal to the jury to act as the conscience of the community is not impermissible." *United States v. Brown*, 887 F.2d 537, 542 (5th Cir. 1989) (cleaned up) (citation omitted). Read in context, the Government's remarks cannot be described as "calculated to inflame." *See id.* Indeed, the Government's remarks in this case are more innocuous than other prosecutor statements that this court has held to be permissible. For example, in *United States v. Brown*, the prosecutor said—in a drug trial— that "drugs are a terrible thing and they are ruining the society," and "it's up to you to do something about it and that is returning a verdict of guilty on these charges." *Id.* This court held that even these statements "did not rise to the level of an improper law and order appeal." *Id.* The argument here was milder than that. Robinson has failed to show error in the Government's purportedly inflammatory remarks.

Second, Robinson argues that the Government referred to facts not in evidence. But the Government is permitted to comment on inferences drawn from the evidence presented at trial, *United States v. Mendoza*, 522 F.3d 482, 491 (5th Cir. 2008), and at least two of the three statements identified by Robinson are "reasonable inferences or conclusions that can be drawn from th[e] evidence." *Id.*

Robinson first argues that the Government detailed the phone call between Anderson and Robinson on the night of the shooting as captured on the body-camera video, even though no evidence revealed Robinson's side of the conversation. Robinson is presumably referring to the Government's statement in closing that "those phone calls is where the obstruction starts. 'Don't call the police. I'll kill your parents.' 'Oh, yeah, you're going to kill my parents? I'm going to kill your kids.'" The latter statement was in evidence, but the first statement ("Don't call the police. I'll kill your parents") is the Government's imagining of what Robinson said to Anderson on the phone and was not in evidence. Nonetheless, it is a fair inference that

No. 22-30442

Robinson said something to that effect. Anderson said on the phone: "You know what? You can kill, you can shoot whoever you want to shoot, son, your . . . children gonna die." She continues, "I don't give a f**k, like I told you, I'm getting money [if] you kill my mama or my dad—kill them." The Government's inferential gloss—that Robinson threatened to kill Anderson's parents—was permissible based on this evidence.

Robinson further objects to the Government's speculation about both the meaning and intent behind his statements on the jail phone call recordings. Specifically, Robinson argues that the Government improperly asserted that Anderson did not want Robinson to know she called the police, even though the evidence showed he knew. The phone calls were fully available to the jury, so if the Government's characterization was belied by the evidence, the jury could easily reject it.

Finally, Robinson contends that the Government improperly implied that Anderson suffered from a history of abuse unknown to the jury. Robinson takes issue with the Government's statement in opening that Anderson "is a vulnerable person who has been through things in life that most people wouldn't be able to comprehend, much less live through and keep surviving." This reference to broader difficulties in Anderson's life was improper. Except for the shooting at issue in this case, the Government did not present any evidence of the purportedly incomprehensible *things*— plural—that Anderson had lived through. The jury was, through this comment, invited to speculate on some unknown horrors of Anderson's life. Nevertheless, even assuming this remark was improper, it—like all the challenged remarks—did not prejudice Robinson.

Robinson failed to demonstrate prejudice from the Government's arguments, much less an error warranting reversal under plain-error review. The "determinative question is whether the prosecutor's remarks cast

25

No. 22-30442

serious doubt on the correctness of the jury's verdict." *Beaulieu*, 973 F.3d at 361 (quoting *Mendoza*, 522 F.3d at 492). "In answering that question, we may consider '(1) the magnitude of the prejudicial effect of the statements, (2) the efficacy of any cautionary instructions, and (3) the strength of the evidence of defendant's guilt.'" *Id.* (quoting *Mendoza*, 522 F.3d at 492).

Here, all three factors compel the conclusion the remarks did not cast serious doubt on the correctness of the jury's verdict. First, the remarks likely had little prejudicial effect. As explained, the Government refrained from inflaming juror passions and drew permissible inferences from the trial evidence. Second, the district court gave explicit instructions that "the questions, statements, objections, and arguments made by the lawyers are not evidence," and that "[t]he function of the lawyer is to point out those things that they feel are most significant and are helpful most to their side of the case." The court continued: "In the final analysis, however, members of the jury, it is your own recollection and interpretation of the evidence that controls in the case. What the lawyers say is not binding upon you." Jurors are presumed to follow instructions. *United States v. Skelton*, 514 F.3d 433, 446 (5th Cir. 2008). Finally, as described above, the evidence of Robinson's guilt as to both counts was strong. The likelihood that any improper remarks by the Government influenced the jury's guilty verdicts is very low.

Accordingly, Robinson is not entitled to a new trial based on the Government's remarks.

## V.

Finally, Robinson argues that his sentence should be vacated and remanded for resentencing because the district court misapprehended its authority to order that Robinson's sentence run concurrently with a previously imposed federal sentence—a revocation sentence issued by Judge Milazzo. Robinson concedes that this issue is subject to plain-error review for

26

trial counsel's failure to object. The Government agrees, acquiescing to a vacatur of Robinson's sentence and a limited remand.

Judge Fallon initially announced that Robinson's sentence would run concurrently with the sentence imposed upon his revocation of supervised release. But after imposition of the sentence, the Government interjected to point out that Judge Milazzo, who had imposed the revocation sentence, had ordered the sentences to run consecutively. As a result of this tangled presentation, the district court retracted its order, stated that Judge Milazzo made the federal sentences consecutive, and ultimately omitted any reference to Judge Milazzo's sentence in the written judgment and instead ordered that the sentence in this case run concurrently only with the state case.

As the Government agrees, Judge Milazzo did not have authority to order that her sentence run consecutively to the sentence imposed in this case. By statute, "if a term of imprisonment is imposed on a defendant who is already subject to an undischarged term of imprisonment, the terms may run concurrently or consecutively." 18 U.S.C. § 3584(a). This court has held that "§ 3854 does not provide a district court authority to order that its sentence run consecutively to an anticipated but not-yet-imposed federal sentence," and moreover that, "as a general principle, one district court has no authority to instruct another district court how, for a different offense in a different case, it must confect its sentence." *United States v. Quintana-Gomez*, 521 F.3d 495, 498 (5th Cir. 2008).

Here, we must correct the district court's conclusion that it was bound by Judge Milazzo's order that the two federal sentences run consecutively. Furthermore, the error affects Robinson's substantial rights. The result of this misapprehension was a retraction of the district court's initial proclamation that the sentence would run concurrently with the other

No. 22-30442

federal sentence. Robinson was sentenced to twenty-seven extra months of federal prison time by virtue of the mistake.

We vacate Robinson's term of imprisonment and remand for the limited purpose of clarifying whether Robinson's prison sentence should run consecutively or concurrently with the revocation sentence.

## VI.

The Government presented sufficient evidence upon which a rational jury could conclude that Robinson was guilty beyond a reasonable doubt of violating 18 U.S.C. § 922(g)(1) and 18 U.S.C. § 1512(c)(2). Moreover, Robinson is not entitled to a new trial based on any evidentiary errors, the failure to give an impeachment instruction, or any improper remarks by the prosecutor. But, as the parties agree, vacatur and remand of Robinson's prison sentence is warranted considering the district court's misapprehension of its sentencing authority.

We AFFIRM Robinson's convictions and VACATE his term of imprisonment and REMAND for a narrow resentencing limited to the sole issue of whether Robinson's prison sentence in this case shall run concurrently or consecutively with his other federal sentence imposed upon revocation of his supervised release.